Argued and submitted January 30, 2014, limited judgment reversed and remanded with instructions to grant defendants' ORS 31.150 special motion to strike June 17, 2015

Patrick J. MULLEN
and Sarah J. Mullen,
*Plaintiffs-Respondents,*

*v.*

MEREDITH CORPORATION,
a foreign business corporation,
dba KPTV; and
Mark Hanrahan,
*Defendants-Appellants.*

Marion County Circuit Court
10C19936; A149990

353 P3d 598

Duane A. Bosworth argued the cause for appellants. With him on the briefs were Derek D. Green and Davis Wright Tremaine LLP.

Rick J. Glantz argued the cause for respondents. With him on the brief were M. David Daniel and Vick & Glantz, LLP.

Before Ortega, Presiding Judge, and Duncan, Judge, and DeVore, Judge.

ORTEGA, P. J.

## ORTEGA, P. J.

This case concerns a television news story about gunshots fired in the West Salem neighborhood where Mullen (plaintiff) and his wife (together, plaintiffs) live. Plaintiffs sued defendants Meredith Corporation, doing business as KPTV, and Hanrahan, a KPTV reporter, because plaintiff was shown for 3.4 seconds in a broadcast of the story, contrary to an agreement that plaintiff, a corrections officer, allegedly had made with defendants due to safety concerns. Plaintiffs asserted claims for breach of contract, negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress.

Defendants responded with a special motion to strike the three tort claims under ORS 31.150, Oregon's anti-SLAPP (Strategic Lawsuits Against Public Participation) statute. The trial court denied defendants' motion and entered a limited judgment based on its determination that defendants had failed to make the necessary *prima facie* showing that plaintiffs' claims "arise[] out of a statement, document or conduct described in [ORS 31.150(2)]." ORS 31.150(3). We disagree with the trial court's reasoning and conclude that defendants established that plaintiffs' tort claims come within the reach of the statute. Accordingly, we proceed to the second inquiry, argued to but not reached by the trial court, and conclude that plaintiffs have failed to show a probability that they will prevail on their tort claims. We therefore reverse the trial court's limited judgment and remand with instructions that the trial court grant defendants' special motion to strike.

In order to provide context for our review, we begin by describing the anti-SLAPP statute. The purpose of ORS 31.150 is to "permit a defendant who is sued over certain actions taken in the public arena to have a questionable case dismissed at an early stage." *Staten v. Steel*, 222 Or App 17, 27, 191 P3d 778 (2008), *rev den*, 345 Or 618 (2009). The statute "provide[s] for the dismissal of claims against persons participating in public issues, when those claims would be privileged under case law, before the defendant is subject to substantial expenses in defending against them." *Id.* at 29 (addressing legislative intent).

ORS 31.150 provides, in relevant part:

"(1) A defendant may make a special motion to strike against a claim in a civil action described in subsection (2) of this section. The court shall grant the motion unless the plaintiff establishes in the manner provided by subsection (3) of this section that there is a probability that the plaintiff will prevail on the claim. The special motion to strike shall be treated as a motion to dismiss under ORCP 21 A but shall not be subject to ORCP 21 F. Upon granting the special motion to strike, the court shall enter a judgment of dismissal without prejudice. If the court denies a special motion to strike, the court shall enter a limited judgment denying the motion.

"(2) A special motion to strike may be made under this section against any claim in a civil action that arises out of:

"*****

"(d) Any other conduct in furtherance of the exercise of *** the constitutional right of free speech in connection with a public issue or an issue of public interest.[1]

"(3) A defendant making a special motion to strike under the provisions of this section has the initial burden of making a prima facie showing that the claim against which the motion is made arises out of a statement, document or conduct described in subsection (2) of this section. If the defendant meets this burden, the burden shifts to the plaintiff in the action to establish that there is a probability that the plaintiff will prevail on the claim by presenting substantial evidence to support a prima facie case. If the plaintiff meets this burden, the court shall deny the motion.

"(4) In making a determination under subsection (1) of this section, the court shall consider pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based."

In *Young v. Davis*, 259 Or App 497, 501, 314 P3d 350 (2013), we explained the two-step process set out in ORS 31.150:

---

[1] The statute also applies to claims that, for example, arise out of oral or written statements made in legislative, executive, or judicial proceedings or in connection with issues being reviewed by legislative, executive, or judicial bodies, or in a public forum in connection with an issue of public interest. ORS 31.150(2).

"Thus, the resolution of a special motion to strike under Oregon's anti-SLAPP statute requires that the court engage in a two-step burden-shifting process. First, the court must determine whether the defendant has met its initial burden to show that the claim against which the motion is made 'arises out of' one or more protected activities described in subsection (2). Second, if the defendant meets its burden, 'the burden shifts to the plaintiff in the action to establish that there is a probability that the plaintiff will prevail on the claim by presenting substantial evidence to support a prima facie case.' If the plaintiff succeeds in meeting that burden, the special motion to strike must be denied. ORS 31.150(3)."

With that context in mind, we take the following facts from the pleadings and from the supporting and opposing affidavits submitted to the trial court, ORS 31.150(4), and state them "in the light most favorable to plaintiffs." *Neumann v. Liles*, 261 Or App 567, 570 n 2, 323 P3d 521, *rev allowed*, 356 Or 516 (2014).

Plaintiff is a sergeant with the Department of Corrections and works at the Oregon State Penitentiary. Inmates, some of whom have since been released, have threatened to kill him. As a result, he keeps his home address private, varies his route home from work, and lists the prison address on his hunting and fishing licenses and with the DMV.

On January 10, 2010, at about 10:00 p.m., gunshots were fired in plaintiffs' neighborhood, some of which struck their home. The next day, three television news crews arrived to report on what had happened. Plaintiff told Hanrahan, a reporter for KPTV, that he was a sergeant for the department and that he was very concerned for his personal safety and that of his family. He told Hanrahan that, if he was shown on the news in front of his home, current and former inmates would discover where he and his family lived, and he asked Hanrahan not to film or identify him in any of the news reports. After Hanrahan agreed not to use his image, plaintiff allowed defendants to film on his property. When plaintiff noticed defendants filming him standing in his yard talking to a neighbor, he approached Hanrahan to ask why he was being filmed. Hanrahan

assured plaintiff that defendants would not broadcast any film that showed him.

That night, defendants twice broadcast the story about the incident, reporting that the gunshots penetrated homes in the neighborhood and discussing the ongoing sheriff's investigation. Those broadcasts did not show plaintiff. According to a declaration from defendants' content director, however, early the following morning the story was recut for a different reporter. In that recut footage, shown in the morning's news broadcast, plaintiff appeared for 3.4 seconds.

When plaintiff returned to work, two of his supervisors told him that they had seen the morning newscast and expressed concern for the safety of plaintiff and his family, and about 25 inmates told plaintiff that they had seen him on television. One inmate told plaintiff that the news report had enough information to allow him to find out where plaintiff lived. Afraid for himself and his family, plaintiff immediately moved his family out of their house and plaintiffs placed the house for sale. They could not afford both rent and mortgage payments and believed they would have to sell in a short sale. The sudden move and the threat of danger were disruptive and stressful for plaintiffs.

Plaintiffs sued defendants, alleging four claims: (1) breach of contract, based on the breach of defendants' promise not to show plaintiff in their news report in exchange for being allowed access onto his property; (2) negligence, based on defendants' failure to prevent the broadcast of plaintiff's likeness, which caused reasonably foreseeable harm to plaintiffs; (3) negligent infliction of emotional distress, based on a special relationship between the parties that imposed on defendants a heightened duty toward plaintiffs; and (4) intentional infliction of emotional distress. Defendants moved to strike the second, third, and fourth claims under ORS 31.150, contending that plaintiffs' claims arose out of defendants' "conduct in furtherance of the exercise of their constitutional right to free speech in connection with a public issue or an issue of public interest." ORS 31.150(2)(d).

In denying defendants' motion to strike, the trial court explained that, although plaintiffs had conceded that news reports of the shooting constitute an issue of public interest, "the analysis cannot end there":

"The more precise issue is whether [d]efendants were entitled to show [plaintiff's] 'likeness', identity and location as part of the news broadcast. In other words, does the filming of [plaintiff] as part of the news broadcast constitute an issue of public interest?"

In concluding that the filming of plaintiff was not "protected expression under ORS 31.150," the court discussed a number of defamation cases addressing the question of what constitutes a public figure, and noted that defendants "could have easily reported the news of the shooting without filming" plaintiff. The court ultimately concluded that defendants had not met their burden to show that the claims arose out of conduct described in section (2) of the statute.

"[W]e review for legal error a trial court's ruling on an ORS 31.150 special motion to strike." *Neumann*, 261 Or App at 572-73. Prior cases have not offered an occasion to address the threshold determination of whether the claim at issue arises out of conduct described in ORS 31.150(2) because, in those cases, the parties had failed to provide properly focused arguments on the issue. *See Young*, 259 Or App at 505; *Newmann*, 261 Or App at 574. This case, then, affords the first occasion for a written decision addressing that issue.

We begin by addressing the trial court's narrowing of the question to "whether [d]efendants were entitled to show [plaintiff's] 'likeness', identity and location as part of the news broadcast" and whether such information constituted an issue of public interest. The trial court, with the aid of defamation cases, focused on whether plaintiff was a public figure whose identity could be a matter of public interest. As explained below, the proper construction of ORS 31.150(2)(d) demonstrates that, in doing so, the court erred.

The question of statutory interpretation is at the heart of this case. To repeat, ORS 31.150(3) provides that "[a] defendant making a special motion to strike * * * has

the initial burden of making a prima facie showing that the claim against which the motion is made arises out of a statement, document or conduct described in [ORS 31.150(2)]." The relevant text in this case is ORS 31.150(2)(d), which provides that the special motion to strike procedure applies to "any claim in a civil action that arises out of * * * [a]ny other conduct in furtherance of the exercise of * * * the constitutional right of free speech in connection with a public issue or an issue of public interest." Our task, then, is to examine the text, context, and legislative history of those sections to determine the meaning that was intended by the legislature. *See State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

The statutory text speaks broadly of "any claim" that arises out of "conduct in furtherance of" free speech rights "in connection with a public issue or an issue of public interest," with the object of determining which claims are subject to the special motion to strike procedure. The trial court, at plaintiffs' urging, narrowed the focus to the specific portion of defendants' conduct that plaintiffs found objectionable. With respect, that inquiry puts the proverbial cart before the horse. The second part of the statutory inquiry in ORS 31.150(3) addresses the merits of the plaintiff's claim against the defendant and, necessarily, whether a *prima facie* case has been made as to the wrongfulness of the defendant's conduct. The first part of the inquiry aims merely to assess more generally what sort of claim this is— in this case, is it one that arises out of conduct in furtherance of free speech in connection with an issue of public interest? Whether every portion of what was said was wrongful cannot be part of that initial inquiry.[2]

---

[2] When examining a defendant's burden under provisions of California's anti-SLAPP statute, Code of Civil Procedure section 425.16, worded identically to ORS 31.150(2)(c) and (d), a California Court of Appeals reached a similar conclusion in *M.G. v. Time Warner, Inc.*, 89 Cal App 4th 623, 629, 107 Cal Rptr 2d 504 (2001):

"Although plaintiffs try to characterize the 'public issue' involved as being limited to the narrow question of the identity of the molestation victims, that definition is too restrictive. The broad topic of the article and the program was not whether a particular child was molested but rather the general topic of child molestation in youth sports, an issue which, like domestic violence, is significant and of public interest."

Moreover, the trial court determined that defendants "could have easily reported the news of the shooting without filming [plaintiff]." That inquiry into whether the specific speech at issue was somehow necessary to the public's understanding of the story being broadcast exceeds the scope of the statutory inquiry. ORS 31.150(2)(d) provides that the special motion to strike procedure applies to any civil claim that arises out of conduct "in furtherance of" the exercise of free speech, not conduct *necessary to* the exercise of free speech. Narrowing the reach of the anti-SLAPP statute to claims that arise only out of conduct that is necessary to free speech rights would narrow its reach beyond what the legislature intended.

The trial court likewise erred in determining that, because plaintiff is not a public figure, defendants' conduct did not constitute an issue of public interest. In reaching that conclusion, the court relied in part on defamation cases addressing constitutional privileges for speech as to public figures. *See, e.g., Wheeler v. Green*, 286 Or 99, 106, 593 P2d 777 (1979) (denying recovery for defamation of a public

---

Likewise, in *Doe v. Gangland Productions, Inc.*, 730 F3d 946 (9th Cir 2013), the United States Court of Appeals for the Ninth Circuit decided a similar issue in which the producers of a television program about gang activity had made assurances that they would conceal the identity of the plaintiff in the program. The plaintiff's identity was not concealed, and the district court denied the defendants' motion to strike under California's anti-SLAPP statute because, though it was uncontested that the broadcast was covered by the anti-SLAPP statute, "'the core of [the p]laintiff's complaint attacks [the d]efendants' broadcast without concealing his identity.'" *Id.* at 954 (emphasis omitted). The Ninth Circuit reversed, concluding that

"a plaintiff's assertion that its claims are 'based on [the defendants'] alleged abusive activity does not ... exempt a lawsuit from anti-SLAPP scrutiny.' *Jarrow Formulas, Inc. v. LaMarche*, 31 Cal 4th 728, 740, 74 P3d 737 (2003). To determine whether a defendant has met its initial burden, a court does not evaluate whether [the] defendant's conduct was lawful or unlawful. *Id.* Instead, 'any "claimed illegitimacy of the defendant's acts is an issue which the plaintiff must raise and support"' in the second step of the analysis when the plaintiff bears the burden to show a probability of prevailing. *Navellier[v. Sletten]*, 29 Cal 4th [82,] 94, 124 Cal Rptr 2d 530, 52 P3d 703 (quoting *Paul for Council v. Hanyecz*, 85 Cal App 4th 1356, 1367, 102 Cal Rptr 2d 864 (2001)). If it were the case that a 'defendant must first establish [that its] actions are constitutionally protected under the First Amendment as a matter of law,' then the '[secondary] inquiry as to whether the plaintiff has established a probability of success would be superfluous.' *Id.* at 94-95 *** (internal quotation marks and citation omitted)."

*Id.*

figure if there is no proof of "convincing clarity" that the "publication was made 'with knowledge that it was false or with reckless disregard of whether it was false or not'") (quoting *New York Times Company v. Sullivan*, 376 US 254, 279-80, 285-86, 84 S Ct 710, 11 L Ed 2d 686 (1964)). That inquiry—asking whether the plaintiff in a defamation lawsuit is a public figure in order to assess whether the defendant has a constitutional privilege—is different from the one before us. Here, we determine whether defendants have made their *prima facie* showing that plaintiffs' claims—for negligence and emotional distress, not defamation—"arise[] out of a statement, document or conduct described in [ORS 31.150(2)]"—here, conduct in furtherance of the exercise of free speech in connection with an issue of public interest. As plaintiffs conceded, and the trial court recognized, "the news reports of the shooting constitute an issue of public interest." It follows that plaintiffs' claims arise from conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest. Accordingly, defendants met their burden of showing under ORS 31.150(3) that plaintiffs' claims were subject to a special motion to strike.

If a defendant makes a *prima facie* showing that the plaintiff's claim arises out of a statement, document, or conduct described in ORS 31.150(2), the burden shifts to the plaintiff "to establish that there is a probability that the plaintiff will prevail on the claim by presenting substantial evidence to support a prima facie case." ORS 31.150(3). If a plaintiff fails to meet that burden, the court must grant the special motion to strike. ORS 31.150(1). Here, because the trial court ruled against defendants on the initial inquiry, it did not reach the question of whether plaintiffs had made the necessary showing. However, that question was fairly presented to the trial court, and the record was sufficiently developed to enable our review of whether there is a probability that plaintiffs will prevail on their tort claims. Accordingly, we proceed to that inquiry.[3] *Cf. Van Driesche*

_____

[3] California takes a similar approach. *See, e.g., Tamkin v. CBS Broadcasting, Inc.*, 193 Cal App 4th 133 142, 122 Cal Rptr 3d 264 (2011) ("On appeal from an order denying an anti-SLAPP motion, the reviewing court independently determines whether both parts of the anti-SLAPP statute are met.") (citing *Rusheen v. Cohen*, 37 Cal 4th 1048, 1055, 39 Cal Rptr 3d 516 (2006)).

*and Van Driesche*, 194 Or App 475, 482 n 2, 95 P3d 262 (2004) (remand to the trial court for findings on an issue was not necessary where the record was fully developed and, even assuming that matters dependent on credibility were resolved in favor of the nonmoving party, that party had failed to meet his burden to rebut a statutory presumption by a preponderance of the evidence). In doing so, we accept as true all evidence favorable to plaintiffs and, although we consider the supporting and opposing affidavits submitted by the parties, we do not weigh plaintiffs' evidence against defendants' to determine whether there is a probability that plaintiffs will prevail. *See Young*, 259 Or App at 509-10. Rather, we consider defendants' opposing evidence "'only to determine if it defeats plaintiff[s]' showing as a matter of law.'" *Id.* at 510 (quoting *Page v. Parsons*, 249 Or App 445, 461, 277 P3d 609 (2012), relying on California cases for that proposition). As to each of plaintiffs' tort claims, we conclude that plaintiffs failed to present substantial evidence to support a *prima facie* case.

We begin with plaintiffs' negligence claim, in which plaintiffs allege that both defendants, Hanrahan and KPTV, "knew or should have known [that] airing [p]laintiff's likeness and location could subject [p]laintiff and his family to harm" and that both were "negligent * * * in failing to prevent the footage of [p]laintiff and his home from being aired." Those allegations parallel the allegations supporting their contract claim, but seek to recover resulting "noneconomic" damages of up to $500,000, presumably for emotional distress. However, because they have failed to allege the sort of damage to property or another legally protected interest independent of their contract with defendants that can support negligence liability for noneconomic damages, they have failed to state a cognizable claim.

Plaintiffs invoke *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987), where the Supreme Court offered this foundational basis for negligence claims in Oregon:

> "[U]nless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm

actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff."

The court later emphasized that a contractual relationship, such as is alleged here, may create, define, or limit the defendant's duty, but does not necessarily have that effect; a contract may alter or eliminate a common-law duty to avoid harming plaintiffs, but otherwise does not bar a negligence action. *Abraham v. T. Henry Construction, Inc.*, 350 Or 29, 37, 249 P3d 534 (2011).

However, that does not end the inquiry in this case. *Abraham* did not alter the longstanding rule that certain types of losses—such as purely economic loss or emotional harm—will not give rise to a negligence claim without a special relationship or property loss. That case, which involved property damage, expressly preserved the general rule regarding economic loss:

> "[T]his court's case law is clear that *economic losses*, such as the ones suffered by the plaintiff in *Georgetown* [*Realty v. The Home Ins. Co*, 313 Or 97, 831 P2d 7 (1992)], are recoverable in negligence only if the defendant is subject to a heightened standard of care, such as one arising out of a special relationship."

*Id*. at 40 (emphasis in original); *see Oregon Steel Mills, Inc. v. Cooper & Lybrand, LLP*, 336 Or 329, 341, 83 P3d 322 (2004) ("[L]iability for purely economic harm 'must be predicated on some duty of the negligent actor to the injured party beyond the common law duty to exercise reasonable care to prevent foreseeable harm.'") (quoting *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 159, 843 P2d 890 (1992)). The court likewise has recently emphasized that emotional-distress damages may not be recovered for negligent conduct in the absence of a physical injury or injury to another legally protected interest. *Paul v. Providence Health System-Oregon*, 351 Or 587, 597-98, 273 P3d 106 (2012).[4]

---

[4] There, the court explained:

"We have *** allowed claims for emotional distress damages in three situations, as summarized in *Hammond* [*v. Central Lane Communications Center*, 312 Or 17, 816 P2d 593 (1991)]: (1) 'where the defendant intended to inflict

Plaintiffs do not allege a physical injury, nor do they identify injury to another legally protected interest apart from what arose under the terms of their contract with defendants—interests that can only be recoverable in contract. As the Supreme Court has explained, where

> "a contract details the specific obligations that each party owes the other, * * * if one party breaches a term of the contract, that breach will result in contract liability. For tort liability to be imposed, however, a tort duty must exist 'independent of the contract and without reference to the specific terms of the contract.'"

*Conway v. Pacific University*, 324 Or 231, 237, 924 P2d 818 (1996) (quoting *Georgetown Realty*, 313 Or at 111 (emphasis omitted)); *see also Bennett v. Farmers Ins. Co.*, 332 Or 138, 163, 26 P3d 785 (2001) (when defendant "began to interfere in plaintiff's business in contravention of a contract term, plaintiff's remedy was in contract only," and citing *Georgetown Realty*, 313 Or at 106).

Because plaintiffs have not alleged any physical injury or injury to any other legally protected interests apart from the contract, and no facts giving rise to any heightened duty "independent of the contract and without reference to the specific terms of the contract," *Georgetown Realty*, 313 Or 111, plaintiffs have failed to demonstrate a probability of prevailing on their negligence claim.

We turn to plaintiffs' claim for negligent infliction of emotional distress. For that claim, plaintiffs allege that, as a "result of [d]efendants' negligent conduct, [p]laintiffs were subjected to extreme humiliation, embarrassment, mental anguish, and other highly unpleasant mental

---

severe emotional distress,' * * * (2) 'where the defendant intended to do the painful act with knowledge that it will cause grave distress, when the defendant's position in relation to the plaintiff involves some responsibility aside from the tort itself,' * * * and (3) 'where the defendant's conduct infringed on some legally protected interest apart from causing the claimed distress, even when that conduct was only negligent * * *.'"

351 Or at 597-98 (quoting *Hammond*, 312 Or at 22-23). Plaintiffs have asserted a separate claim for intentional infliction of emotional distress, addressed below. They have also asserted a claim for negligent infliction of emotional distress, addressed below, in which they argue that a special relationship brings their claim within the second of the three criteria. They do not assert the existence of a special relationship in support of their negligence claim.

or emotional reactions lasting over a prolonged period of time." Plaintiffs further allege that, in the course of forming the contract between the parties, they "authorized [d]efendants to exercise their independent judgment on [p]laintiffs' behalf" and that, when defendants "accepted this responsibility," a "special relationship was formed" between the parties.

As noted above, in the absence of a physical injury, Oregon law allows recovery of emotional-distress damages for nonintentional conduct only where the defendant acted "with knowledge that it[s actions will] cause grave distress, when the defendant's position in relation to the plaintiff involves some responsibility aside from the tort itself"; and "where the defendant's conduct infringed on some legally protected interest apart from causing the claimed distress." *Paul*, 351 Or at 597. Plaintiffs argue that both criteria support their claim for negligent infliction of emotional distress—that is, that defendants had a heightened duty through a "special relationship" that existed "aside from the tort itself" and that defendants invaded a legally protected interest other than their interest in not being exposed to severe emotional distress.

We first address plaintiffs' argument that defendants owed a heightened duty to plaintiffs because a special relationship had been formed. In *Conway*, the Supreme Court examined the "types of relationships in which one party owes the other a duty to exercise reasonable care beyond the common law duty to prevent foreseeable harm" and explained that

"[t]his special responsibility exists in situations in which one party has hired the other in a professional capacity [(*e.g.*, lawyer, physician, engineer, architect)], as well as in principal-agent and other similar relationships [(*e.g.*, fiduciary, trustee)]. It also exists in the type of situation described in *Georgetown Realty*, in which one party has relinquished control over the subject matter of the relationship to the other party and has placed its potential monetary liability in the other's hands. In all those relationships, one party has authorized the other to exercise independent judgment in his or her behalf and, consequently, the party who owes the duty has a special responsibility to administer,

oversee, or otherwise take care of certain affairs belonging to the other party."

324 Or at 240-41.

Plaintiffs here argue that they trusted defendants to "exercise independent judgment and special skills and experience to create images and make the technical adjustments necessary to editing broadcast footage to protect" plaintiffs. However, plaintiffs' complaint and affidavits do not assert evidence of such a relationship, and plaintiffs' suggestion that they "authorize[ed] defendants to exercise independent judgment on their behalf" is overstated. Here, defendant Hanharan and plaintiff were strangers to each other before the agreement, which was limited to the term that defendants could come onto plaintiffs' property if they agreed not to air plaintiff's likeness. That agreement did not form a special relationship; defendants were not acting as plaintiffs' agents, and plaintiffs did not relinquish control of matters to defendants that required them to exercise independent judgment on plaintiffs' behalf. That is so because plaintiffs could not relinquish control of an activity—filming, editing, or broadcasting a news report—that they never had in the first place. Thus, defendants did not owe a heightened duty to plaintiffs that would support a claim for noneconomic damages absent a personal injury.

We next address plaintiffs' contention that defendants invaded a legally protected interest other than their interest in not being exposed to severe emotional distress. They assert that they had a "legal interest in their enjoyment of peace and solitude and the family's safety and protection from harms by others which were negligently invaded by defendants." Leaving aside the fact that plaintiffs did not plead or argue such an interest in their response to defendants' special motion to strike, plaintiffs have not cited any authority that recognizes legal interests like the ones they describe. Their citation, for the first time on appeal, to *Macca v. Gen. Telephone Co. of N.W.*, 262 Or 414, 418, 495 P2d 1193 (1972), is likewise unavailing. There, the court held that the erroneous listing of a telephone number that led to numerous and repeated telephone calls to the plaintiff constituted an invasion of the plaintiff's right to enjoy

her property without unreasonable interference—but, as we have noted before, the rationale of *Macca* applies only to similar invasions—"claims that invoke nuisance, trespass or similar legal principles." *Rathgeber v. James Hemenway, Inc.*, 176 Or App 135, 148, 30 P3d 1200 (2001), *aff'd*, 335 Or 404, 69 P3d 710 (2003). We decline to extend it here to a claim that lacks an interference with plaintiffs' use of their property.

Lacking a special relationship or the invasion of a legally protected interest in the absence of a physical injury, plaintiffs therefore have failed to demonstrate a probability of prevailing on their claim for negligent infliction of emotional distress as required under ORS 31.150(3).

Finally, we turn to plaintiffs' claim for intentional infliction of emotional distress, in which they alleged that "[i]n airing [p]laintiff's likeness and location, [d]efendants intended to inflict severe mental or emotional distress or knew the distress was certain to result from [d]efendants' conduct" and that defendants' "behavior consisted of some extraordinary transgression of the bounds of socially tolerable conduct or exceeded any reasonable limit of social toleration."

A claim for intentional infliction of emotional distress must contain the following elements: "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *Sheets v. Knight*, 308 Or 220, 236, 779 P2d 1000 (1989).

Plaintiffs acknowledge that they lack evidence that defendants or any of their employees desired to cause plaintiffs emotional distress. They argue, however, that the element of intent "does not require a malicious motive or a purposeful design to inflict emotional distress on the plaintiff," *Delaney v. Clifton*, 180 Or App 119, 132, 41 P3d 1099 (2002), and can depend on the defendant "know[ing] that such distress is certain, or substantially certain, to result from his conduct." *McGanty v. Staudenraus*, 321 Or 532, 550, 901 P2d 841

(1995) (quoting *Restatement (Second) of Torts* § 46 comment i (1965). In plaintiffs' view, under that definition of intent, the evidence is sufficient because "every aspect of the reporting and on-air broadcast was within [d]efendants' control" and defendants "knew that severe emotional distress was substantially certain to result from [their] conduct of airing identifying matters."

Contrary to plaintiffs' argument, however, the evidence does not support a finding of anything more than negligent conduct by defendants. At most, defendants unreasonably failed to make all of their employees aware of the promise made to plaintiff and to prevent the harm that could follow from breaking that promise. Plaintiffs have not presented evidence that the person or persons responsible for re-editing or broadcasting the footage knew that depicting plaintiff would result in plaintiffs' severe emotional distress.[5] Evidence that the broadcast was within defendants' control is not enough to establish intent. Accordingly, plaintiffs have not demonstrated a probability of prevailing on their claim for intentional infliction of emotional distress.

In conclusion, defendants met their burden of establishing a *prima facie* showing that plaintiffs' claims arose out of a statement, document or conduct described in ORS

---

[5] Intentional infliction of emotional distress also requires that a defendant's act constitutes an "extraordinary transgression of the bounds of socially tolerable conduct." *Sheets*, 308 Or at 220. We have stated that

"[t]he relationship between the parties has particular bearing on potential characterization of the conduct as extreme or outrageous. That is so because 'a defendant's position or role *vis-à-vis* a plaintiff may be one that "imposes on the defendant a greater obligation to refrain from subjecting the victim to abuse, fright, or shock than would be true in arm's-length encounters among strangers."' *Williams* [*v. Tri-Met*], 153 Or App [686,] 689-90, 958 P2d 202 (quoting *McGanty* [*v. Staudenraus*], 321 Or [532, 547-48, 901 P2d 841 (1995)]). In fact, the lack of such a relationship generally defeats a conclusion that the conduct is actionable through an IIED claim."

*Delaney*, 180 Or App at 130. Plaintiffs on appeal argue that the special relationship they posited in support of their claim for negligent infliction of emotional distress applies for the intentional infliction of emotional distress claim and that the special relationship made the "re-editing and broadcast an extreme and outrageous act." As discussed above, we conclude that the parties did not have a special relationship, and plaintiffs have not explained how the arms-length agreement and brief interaction between plaintiff and defendants imposed on defendants an increased obligation to avoid subjecting plaintiffs to severe emotional distress.

31.150(2), specifically, ORS 31.150(2)(d)—conduct in furtherance of the exercise of defendants' right to free speech in connection with a public issue or an issue of public interest. Plaintiffs have not met their consequent burden of establishing that there is a probability that they will prevail on their tort claims. Therefore, defendants' special motion should have been granted. Accordingly, we reverse the court's limited judgment.

Limited judgment reversed and remanded with instructions to grant defendants' ORS 31.150 special motion to strike.