Argued and submitted May 9, reversed and remanded September 8, 2016, petition for review denied February 2, 2017 (360 Or 851)

John PLOTKIN,
*Plaintiff-Appellant,*

*v.*

STATE ACCIDENT INSURANCE FUND,
an independent public corporation;
Catherine Travis; Robb Van Cleave;
Krishna Balasubramani; and Kevin Jensen,
individually and in their capacity as members of the
State Accident Insurance Fund's Board of Directors;
Chris Davie and Ryan Fleming,
individual State Accident Insurance Fund employees
sued in their individual capacities,
*Defendants,*

*and*

Brenda ROCKLIN,
an individual,
*Defendant-Respondent.*

Marion County Circuit Court
14C17973; A159273

385 P3d 1167

Claudia M. Burton, Judge.

Andrew Altschul argued the cause for appellant. With him on the briefs were Dana L. Sullivan and Buchanan Angeli Altschul & Sullivan LLP.

William F. Gary argued the cause for respondent. With him on the brief were C. Robert Steringer, Brett Applegate, and Harrang Long Gary Rudnick P.C.

Before Armstrong, Presiding Judge, and Egan, Judge, and Shorr, Judge.

**SHORR, J.**

This tort action arises from plaintiff John Plotkin's short-lived tenure as CEO of SAIF Corporation (SAIF) and, for purposes of this appeal, involves the grant of a special motion to strike under ORS 31.150, Oregon's Anti-Strategic Lawsuits Against Public Participation (anti-SLAPP) statute, which creates a two-step procedure for expeditiously dismissing unfounded lawsuits attacking certain types of public speech.

SAIF is an independent public corporation that provides workers' compensation insurance to Oregon employers. Three months after plaintiff started as CEO, SAIF's board dismissed him. After his termination, plaintiff brought claims against multiple defendants. This appeal pertains only to plaintiff's claim for intentional interference with economic relations against defendant Brenda Rocklin, who immediately preceded him as CEO of SAIF. Plaintiff appeals the trial court's grant of defendant's special motion to strike that claim under ORS 31.150. He argues, among other things, that the court erred in concluding (1) that defendant met her initial burden to show that plaintiff's claim came within the reach of ORS 31.150, and (2) that plaintiff failed to meet his evidentiary burden at the second step of the anti-SLAPP procedure. As explained below, we conclude that, although the trial court's threshold determination that plaintiff's claim is susceptible to an anti-SLAPP motion to strike was correct, it erred in concluding that plaintiff failed to satisfy his burden at the second step of the analysis, and in granting the motion to strike on that basis. Accordingly, we reverse and remand for further proceedings.[1]

To provide context for the underlying facts, we briefly describe the purpose and procedure of ORS 31.150, set out

___

[1] Plaintiff also assigns error to the trial court's award of attorney fees and costs to defendant in connection with the motion to strike. *See* ORS 31.152 (providing that a defendant who prevails on a special motion to strike shall be awarded reasonable attorney fees and costs). Because we conclude that the trial court erred in granting the motion to strike, we reverse that award as well.

In his third assignment of error, plaintiff argues that the trial court erred in refusing to deny the motion to strike as untimely, contending that defendant's filing of that motion simultaneously with an ORCP 21 A motion to dismiss renders the motion to strike untimely. We reject that argument without discussion.

below, 280 Or App at 821, and our standard of review. "Oregon's anti-SLAPP statute creates an expedited procedure for dismissal of certain nonmeritorious civil cases without prejudice at the pleading stage." *Neumann v. Liles*, 358 Or 706, 723, 369 P3d 1117 (2016); *see Staten v. Steel*, 222 Or App 17, 29, 191 P3d 778 (2008), *rev den*, 345 Or 618 (2009) (the purpose of ORS 31.150 is "to provide for the dismissal of claims against persons participating in public issues * * * before the defendant is subject to substantial expenses in defending against them" through the creation of "a special motion to strike against a claim that arises out of the exercise of the right of petition or free speech in connection with a public issue or an issue of public interest").

That statute outlines a procedure that "requires that the court engage in a two-step burden-shifting process." *Young v. Davis*, 259 Or App 497, 501, 314 P3d 350 (2013). When a defendant brings a motion to strike under ORS 31.150, the court must first determine "whether the defendant has met its initial burden to show that the claim against which the motion is made 'arises out of' one or more protected activities" described in ORS 31.150(2). *Id.* If the defendant meets its burden, "the burden shifts to the plaintiff in the action to establish that there is a probability that the plaintiff will prevail on the claim by presenting substantial evidence to support a *prima facie* case," and "[i]f the plaintiff succeeds in meeting that burden, the special motion to strike must be denied." *Id.* (describing ORS 31.150(3) (internal quotation marks omitted)).

We review a trial court's ruling on an ORS 31.150 special motion to strike for legal error. *Yes On 24-367 Committee v. Deaton*, 276 Or App 347, 350-51, 367 P3d 937 (2016). In conducting that review, we take the facts from the pleadings and from the supporting and opposing declarations and affidavits submitted to the trial court, ORS 31.150(4), and we view the facts underlying plaintiff's claim in the light most favorable to plaintiff. *Mullen v. Meredith Corp.*, 271 Or App 698, 702, 353 P3d 598 (2015).

Thus, in reviewing the grant of the motion to strike, we do not find or decide the facts in this case. Rather, we consider plaintiff's evidence and draw the reasonable inferences

from that evidence in favor of plaintiff. *OEA v. Parks*, 253 Or App 558, 566-67, 291 P3d 789 (2012), *rev den*, 353 Or 867 (2013). Thus, where there is a conflict between the parties' proffered factual narratives and evidence—and there are many in this case—we necessarily adopt the version most favorable to plaintiff, so long as it is supported by substantial evidence. *See Young*, 259 Or App at 508 (stating that "the presentation of substantial evidence to support a *prima facie* case is, *in and of itself*, sufficient to establish a probability that the plaintiff will prevail" and, thus, survive the motion to strike) (emphasis in original)). "[W]e consider defendant['s] opposing evidence only to determine if it defeats plaintiff['s] showing as a matter of law." *Mullen*, 271 Or App at 708 (internal quotation marks omitted). We state the following facts consistent with that standard of review.

Plaintiff replaced defendant as SAIF's CEO on February 3, 2014. Defendant, who was retiring, stayed on for a one-month transition period. During that time, plaintiff and defendant spent several days on a business trip, during which plaintiff "told [defendant] a story about milking goats in relation to a cheese-making class [he] took with [his] wife." Although plaintiff may have referred to goat "teats" in telling the story, plaintiff states that he "never used the word 'tits,' whether in relation to goats, women, or anything else." Defendant did not find those comments to be offensive or sexually discriminatory.

On April 22, well after the transition period ended, defendant had dinner with Ryan Fleming, SAIF's vice president of operations and human resources. Fleming told defendant that several employees had complained about "inappropriate comments plaintiff had made in and around the workplace," and sought defendant's "advice and counsel" on how to handle that matter. Defendant relayed to Fleming the statements plaintiff made during their joint business trip. According to notes Fleming made following that dinner, defendant told Fleming that plaintiff had "talked about a woman's 'tits'" during the business trip.

In the period leading up to plaintiff's termination in early May, defendant maintained regular contact with Fleming and another SAIF representative, Chris Davie,

who served on SAIF's board and as its vice president of corporate policy and external affairs. Defendant also spoke with SAIF board chair Catherine Travis during that crucial period.[2] For instance, defendant had multiple lengthy calls with Fleming on May 1, 2, and 3, the last day being the day that Fleming and Travis called plaintiff to ask him to resign. Defendant also spoke with Davie, who was involved in the discussions regarding terminating plaintiff, several times for nearly three hours in total from April 29 to May 2.

Board chair Travis called defendant on May 1 concerning various complaints regarding plaintiff; the possibility that plaintiff might be terminated; and whether defendant (or others) would be interested and suitable for replacing plaintiff as an interim CEO if he were terminated. During that conversation about the various complaints against plaintiff, Travis stated that she knew "that plaintiff had said something to [defendant]." In turn, defendant "only confirmed that plaintiff had, in fact, said something to me."

Travis and Fleming then called plaintiff at home on Saturday, May 3. Travis told plaintiff that they had the board votes to terminate him and requested his resignation. Plaintiff, who had not previously been informed of any allegations against him, had "no idea" what was going on. When he inquired why he was being asked to resign, Travis explained only that plaintiff had "allegedly engaged in actions that could trigger claims based upon 'protected class status.'"

Plaintiff refused to resign. On May 9, he received a letter informing him that SAIF's board of directors had dismissed him. The dismissal was controversial. Some SAIF executives believed that it was the product of a turf war within SAIF's executive ranks and that defendant, the retired former CEO, was overly involved in those matters. It later came to light that Fleming's notes of plaintiff's statements to defendant and certain SAIF employees conflicted with their recollection of their statements, to the extent that several employees claimed that Fleming's reporting of the events was false and inaccurate. All of the individuals who

---

[2] Fleming, Davie, and Travis are all defendants in the predicate action, but are not involved in this appeal.

had supposedly witnessed inappropriate comments later denied that the incidents had occurred or asserted that the content of the statements was decidedly different (and far less likely to be viewed as offensive) than what Fleming had reported. Plaintiff later learned that Davie had "coordinated the messaging" around the termination, and that Fleming and Davie had orchestrated the termination without informing other SAIF executives. Their colleagues were dismayed to learn that defendant and another retired executive had been involved in the termination planning.

After his dismissal, plaintiff brought his intentional interference claim against defendant, alleging, among other things, that defendant's involvement in the events leading up to his termination constituted intentional interference with his business relationship with his former employer.[3] As pertinent here, the operative complaint alleged that defendant was involved in a plot to get plaintiff fired and "made a false and defamatory report that [plaintiff] had made a comment to her that was sexually discriminatory and falsely claimed that she found the comment offensive," and that defendant and others acted "intentional[ly], willful[ly], and with reckless disregard" when they "carried out their plan to bring about [plaintiff's] termination." More particularly, the complaint alleged that defendant falsely "reported that [plaintiff] had 'talked about a woman's tits' while she and [plaintiff] were on a road trip throughout the state while [defendant] was still employed by SAIF." It alleged:

> "In fact, the comment to which Rocklin was referring related to a story that Plotkin told Rocklin about attending a cheese-making class with his wife. Within the context of that story, Plotkin made a comment about goat teats. He was aware that Rocklin grew up in an Idaho ranching community and did not anticipate that she would be offended by discussion related to milking goats. Rocklin deliberately described the comment as one about women's breasts to create the false and harmful impression that Plotkin had engaged in sexual harassment."

---

[3] The complaint included numerous claims and allegations not at issue before us on appeal, including allegations of public meetings law violations and that defendant made a defamatory statement about plaintiff. On appeal, plaintiff focuses on the allegation that defendant purposefully made a false statement as part of a plot to get plaintiff fired.

Defendant responded with a special motion to strike the claim under ORS 31.150. Defendant contended that the claim was subject to the anti-SLAPP procedure because the conduct at issue arose out of oral or written statements submitted in connection with an issue under consideration by an executive body, ORS 31.150(2)(b), and was in furtherance of the exercise of the right to free speech in connection with an issue of public interest, ORS 31.150(2)(d).

Defendant also advanced a number of arguments in connection with the second step of the anti-SLAPP analysis. She contended that plaintiff had not adduced substantial evidence of intentional interference, arguing, in particular, that plaintiff had failed to produce evidence of the improper means and causation elements of that tort. In addition, defendant argued that plaintiff's *prima facie* burden went beyond the elements of intentional interference because the claim arose from speech, specifically arguing that (1) plaintiff was subject to the "heightened standard attached to defamation claims against public officials" under the First and Fourteenth Amendments to the United States Constitution, because the allegedly tortious conduct involved "charges of sexual harassment" against a public official; (2) plaintiff's claim was barred by absolute privilege; and (3) plaintiff was required to adduce evidence capable of defeating the affirmative defense of qualified privilege to survive the motion to strike.

In opposing the motion to strike, plaintiff countered that, as a threshold matter, the anti-SLAPP procedure was inapposite. Plaintiff further argued that, even if the claim was subject to ORS 31.150, his burden at the second step of the analysis was less stringent than defendant had proposed. Because his claim was one for intentional interference (not defamation), plaintiff asserted that he need only produce evidence meeting each of the *prima facie* elements of that tort for purposes of the anti-SLAPP procedure, and was not required to overcome affirmative defenses. Plaintiff's evidence included his declaration concerning what was actually said in his "goat-milking" conversation with defendant, defendant's declaration and recollection of the events, phone records showing that defendant had been in frequent contact

with the SAIF officials who orchestrated his termination, and notes from defendant's meeting with Fleming reflecting that defendant told Fleming that plaintiff had made an inappropriate comment to her about a "woman's 'tits.'"

The trial court granted the motion to strike. It concluded that the claim was subject to the anti-SLAPP procedure on both grounds proposed by defendant, involving "speech on an issue that was under consideration by an executive agency," ORS 31.150(2)(b), and "speech on a matter of public interest," ORS 31.150(2)(d). At the second prong of the analysis, it concluded that plaintiff had failed to make a *prima facie* case for intentional interference because there was not substantial evidence of the elements of improper means and causation. With respect to improper means, the court explained that the evidence concerning defendant and plaintiff's conversation about goat milking did not lead to a reasonable inference that defendant had made a false or defamatory statement about plaintiff. As to causation, the court said that the evidence presented by plaintiff, particularly the phone records, did not support a reasonable inference that defendant had any involvement whatsoever in the termination or had conspired to get plaintiff fired. The court also reasoned that there was not substantial evidence that defendant's statement to Fleming played even a small role in plaintiff's termination, let alone evidence that it was a "but-for" cause. The court did not reach defendant's public figure defamation, absolute privilege, and qualified privilege theories.

On appeal, plaintiff challenges the trial court's conclusions at both steps of the anti-SLAPP analysis, and both parties generally reiterate their previous arguments. Thus, this case requires us to analyze, first, whether this action is subject to an anti-SLAPP motion, and, second, whether plaintiff established a *prima facie* case sufficient to withstand the motion to strike. For the reasons that follow, the trial court's threshold conclusion that this action is subject to ORS 31.150 is correct. However, the court erred in granting the motion to strike based on an erroneous conclusion that plaintiff did not meet his burden at the second step of the anti-SLAPP procedure.

ORS 31.150 provides, in relevant part:

"(1)   A defendant may make a special motion to strike against a claim in a civil action described in subsection (2) of this section. The court shall grant the motion unless the plaintiff establishes in the manner provided by subsection (3) of this section that there is a probability that the plaintiff will prevail on the claim. The special motion to strike shall be treated as a motion to dismiss under ORCP 21 A but shall not be subject to ORCP 21 F. Upon granting the special motion to strike, the court shall enter a judgment of dismissal without prejudice. If the court denies a special motion to strike, the court shall enter a limited judgment denying the motion.

"(2)   A special motion to strike may be made under this section against any claim in a civil action that arises out of:

"* * * * *

"(b)   Any oral statement made, or written statement or other document submitted, in connection with an issue under consideration or review by a legislative, executive or judicial body * * *;

"* * * * *

"(d)   Any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

"(3)   *A defendant making a special motion to strike under the provisions of this section has the initial burden of making a prima facie showing that the claim against which the motion is made arises out of a statement, document or conduct described in subsection (2) of this section.* If the defendant meets this burden, the burden shifts to the plaintiff in the action to establish that there is a probability that the plaintiff will prevail on the claim by presenting substantial evidence to support a prima facie case. If the plaintiff meets this burden, the court shall deny the motion."

(Emphasis added.)

Thus, under subsection (3), which establishes the burdens at both steps of the analysis, defendant was initially

required to demonstrate that the claim arises out of activity described in subsection (2), which sets out several categories. As noted above, the trial court concluded that this action qualifies under subsections (2)(b) and (2)(d). Because we conclude that this action is subject to subsection (2)(d), we need not address whether it also qualifies under subsection (2)(b).

ORS 31.150(2)(d) provides that any claim in a civil action that arises out of "[a]ny other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest" is subject to an anti-SLAPP motion. We focus, as the trial court did, on how defendant's conduct was in furtherance of her "constitutional right of free speech in connection with * * * an issue of public interest." The trial court reasoned that "[c]learly the conduct of the head of one of our most important agencies and * * * one of the highest-paid executives in state government is a matter of public interest." We agree with that straightforward assessment. Subsection (2)(d) encompasses the conduct at the heart of this claim, a comment defendant allegedly made about the professional conduct of the leader of a public corporation. *See Mullen*, 271 Or App at 705-06 (noting that subsection (2)(d) "speaks broadly of 'any claim' that arises out of 'conduct in furtherance of' free speech rights 'in connection with a public issue or an issue of public interest,'" requiring a generalized assessment of the factual basis of the claim). The trial court did not err in concluding that this action comes within the reach of ORS 31.150.

We turn to plaintiff's second assignment of error, challenging the trial court's conclusion that plaintiff failed to satisfy his burden, at the second step of the anti-SLAPP procedure, to "establish that there is a probability that [he] will prevail on the claim by presenting substantial evidence to support a prima facie case." ORS 31.150(3). We conclude that plaintiff made the necessary showing.

The *prima facie* elements of a claim for intentional interference are

"(1) the existence of a professional or business relationship * * *, (2) intentional interference with that relationship,

(3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages."

*McGanty v. Staudenraus*, 321 Or 532, 535, 901 P2d 841 (1995). Only the elements of improper means and causation are at issue here. We limit our analysis accordingly.

To satisfy the element of improper means, the actionable conduct must be "wrongful by some measure beyond the fact of the interference itself." *Top Service Body Shop v. Allstate Ins. Co.*, 283 Or 201, 209, 582 P2d 1365 (1978). Measures "[c]ommonly included among improper means are violence, threats or other intimidation, *deceit or misrepresentation*, bribery, unfounded litigation, defamation, or disparaging falsehood." *Id.* at 210 n 11 (emphasis added).

Plaintiff's theory of improper means relies on plaintiff's allegation that defendant purposely made a false statement to Fleming about plaintiff's comments about milking goats, that is, falsely reporting instead that plaintiff made a comment about a "woman's 'tits.'" *See* 280 Or App at 816 (describing the allegations). Viewing the record in the light most favorable to plaintiff, we conclude that there is substantial evidence to support that allegation. Although plaintiff and defendant dispute what plaintiff actually said during the goat-milking conversation, under our standard of review, we must accept plaintiff's declaration that his remarks were limited to goat milking and did not extend to human anatomy. It is also reasonable to infer that defendant heard what plaintiff said during that conversation and did not find it to be problematic personally or professionally. Further, there is evidence to support an inference that defendant later told Fleming that plaintiff had made an inappropriate comment about "a woman's 'tits,'" and that defendant subsequently confirmed in a conversation with SAIF's board chair, Travis, regarding plaintiff's conduct, that defendant had also "said something to me." Moreover, under the circumstances—particularly taking into account defendant's position and experience, and that she made that statement during a meeting in which Fleming was actively seeking her advice about how to pursue a human resources

investigation against plaintiff—it is reasonable to infer that defendant was aware that her statement would have negative repercussions for plaintiff's continued employment with SAIF.

As to causation, plaintiff argues that the trial court erred in concluding that there was no evidence from which a reasonable juror could find a causal effect between the interference (defendant's claimed false statement to Fleming) and the damage to the economic relationship (plaintiff's subsequent termination). We agree with plaintiff that, drawing all reasonable inferences in favor of plaintiff, the evidence at least supports a *prima facie* case that defendant's statement to SAIF's human resources representative, Fleming, had a "causal effect" on plaintiff's termination. *See McGanty*, 321 Or at 535 (requiring proof of a "causal effect" between the intentional interference and the damage to the economic relationship between the plaintiff and the third party).

That evidence draws from, among other sources, plaintiff's declaration, Fleming's notes, defendant's declaration, and several documents confirming numerous communications between defendant, on the one hand, and members of the SAIF board and executive team, on the other, in the weeks and days leading up to and immediately following SAIF's termination of plaintiff. The evidence and the reasonable inferences that can be drawn from that evidence would allow a reasonable juror to find that plaintiff's disputed statement to defendant, when relayed to SAIF representatives, had a causal effect on the SAIF board's termination of plaintiff.

That evidence shows that Fleming, as SAIF's human resources executive, was building a case against plaintiff that he intended to bring to the board and asked defendant to advise him in that endeavor, and that the statement at issue was one of several that were ultimately brought to the board's attention. It also shows that defendant spoke with Travis, the board chair, during a conversation in which Travis was investigating several inappropriate comments claimed to be made by plaintiff, and it can at least be inferred that defendant generally confirmed some inappropriate comment had been made to her. Soon after, Travis asked plaintiff to

resign in connection with "actions that could trigger claims based upon 'protected class status.'"

Indeed, it is reasonable to infer that both Travis, the board chair, and Fleming believed that plaintiff's statement to defendant was a significant factor in the board's decision to ask plaintiff to resign—and ultimately to terminate him. When Travis and Fleming called plaintiff to ask him to resign on Saturday, May 3, Travis gave plaintiff only a vague explanation, saying that the reason for the request related to plaintiff's conduct "that could trigger claims based upon 'protected class status.'" After that conversation and on that same Saturday, Travis had Fleming call defendant to get defendant's permission to share further details with plaintiff regarding plaintiff's statement about a "woman's tits."[4] A reasonable inference from those two events is that Travis and Fleming believed that plaintiff's statement to defendant *was* a significant factor in seeking plaintiff's resignation, which then quickly proceeded to his termination within a week.

In addition, as noted, the phone records show that, after the initial dinner meeting at which defendant relayed plaintiff's statement to Fleming, they stayed in frequent contact. Defendant called Fleming seven times between May 1 and May 3 (the date that plaintiff was asked to resign) and she regularly spoke with Davie in the weeks before the termination, with 12 calls between May 1 and May 9. Under the circumstances—and particularly considering the timing of the calls and the nature of the participants' relationships, positions, and work responsibilities—it is reasonable to infer that their discourse related to plaintiff's termination. Moreover, numerous internal communications show that Fleming and Davie were heavily involved in the

---

[4] Defendant submitted evidence below that, upon receiving this call, she corrected Fleming and explained that plaintiff had *not* used the term "woman's tits" during their business trip together, but otherwise permitted Fleming to pass on the accurate story. As discussed further below, a reasonable juror might credit defendant's account over plaintiff's account and find that defendant did not make any deceitful statements or misrepresentations regarding plaintiff's statement, but the issue for us is whether plaintiff presented sufficient evidence to present a *prima facie* case in his favor. *Young*, 259 Or App at 508-09. It is not to weigh plaintiff's evidence against defendant's opposing evidence, but only to determine if defendant's evidence defeats plaintiff's evidence as a matter of law, which is not the case here. *Id.* at 509-10.

termination process, and that their colleagues viewed their dealings as furtive and unorthodox, believed that defendant was involved, and were highly critical of the entire course of events.

Taken together, all of that evidence and the reasonable inferences drawn from it, if credited, support plaintiff's assertion that defendant made a false statement to Fleming regarding plaintiff that had a "causal effect" on SAIF's termination of plaintiff. Thus, the trial court erred in concluding, at the second step of the anti-SLAPP procedure, that plaintiff failed to meet his evidentiary burden to present a *prima facie* case.

We note that our task at the second step under ORS 31.150(3) is only to determine if there is "substantial evidence to support a prima facie case" and "the goal, similar to that of summary judgment, is to weed out meritless claims meant to harass or intimidate." *Young*, 259 Or App at 508-09; *see also* ORS 31.150(3) (stating that plaintiff meets its burden to show a "probability" of prevailing on a claim "by presenting substantial evidence to support a prima facie case"). We base our decision on the evidence and the reasonable inferences to be drawn from that evidence. *OEA*, 253 Or App at 566-67. We do not "weigh" plaintiff's evidence against defendant's *opposing* evidence at the second step of the analysis. *Young*, 259 Or App at 509 (emphasis added). Thus, as we have stated, "whether or not it is 'likely' that the plaintiff will prevail is irrelevant in determining whether [plaintiff] has met the burden of proof set forth by ORS 31.150(3)." *Id.* at 508. Indeed, a reasonable juror could fully credit *defendant's* evidence and find that defendant did not misrepresent any facts to SAIF regarding plaintiff's statements, or find that any claimed misrepresentation was not a cause of plaintiff's termination. The issue, however, is whether plaintiff presented "substantial evidence to support a prima facie case," ORS 31.150(3), and we conclude that plaintiff presented such evidence.

We turn next to defendant's enhanced burden arguments. Although not expressly framed as such, those arguments present three potential alternative grounds upon which to affirm the trial court's ruling at the second step of

the anti-SLAPP procedure. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (under the "right for the wrong reason" doctrine, an appellate court may affirm the ruling of a trial court on a basis other than that upon which the trial court relied under certain circumstances). Defendant argues that plaintiff failed to provide evidence sufficient to overcome (1) the First Amendment enhanced burden for a defamation claim brought by a public official relating to his public duties, (2) an absolute privilege, and (3) a qualified privilege. As noted above, defendant raised those arguments before the trial court but, given the court's conclusion that plaintiff had failed to make his *prima facie* case for intentional interference, the court did not reach them.

As explained below, those arguments present substantial issues of statutory and constitutional law that are insufficiently developed. Accordingly, we elect not to consider or decide them. *See Biggerstaff v. Board of County Commissioners*, 240 Or App 46, 56, 245 P3d 688 (2010) (stating that "our consideration of an alternative basis for affirmance is a matter of prudential discretion and not compulsion"; where alternative contentions "present substantial issues of statutory and constitutional law" and are not fully developed, that circumstance "can militate against" exercising our discretion to consider them); *State v. Brand*, 257 Or App 647, 651, 307 P3d 525 (2013) (declining, as a prudential matter, to address an undeveloped constitutional claim: it is not our "'proper function to make or develop a party's argument when that party has not endeavored to do so itself'" (quoting *Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to on recons*, 187 Or App 472, 68 P3d 259 (2003))).

Defendant's first alternative contention is that the First Amendment standard for defamation claims by public figures and officials requires plaintiff to establish that defendant acted either with "actual malice," *New York Times Co. v. Sullivan*, 376 US 254, 279-80, 84 S Ct 710, 11 L Ed 2d 686 (1964), or "express malice," *McDonald v. Smith*, 472 US 479, 484, 105 S Ct 2787, 86 L Ed 2d 384 (1985). In order to decide that issue, however, we would have to also

decide that federal constitutional defamation law extends to other common-law torts, such as the intentional interference claim at issue here. As nearly as we can tell, that issue has not been decided in this or many other jurisdictions. *Cf.* Harper *et al*, 2 *Harper, James and Gray on Torts* § 6.1A, 331 (3d ed 2006) (noting that, although an extension of constitutional defamation restrictions was anticipated by Prosser and Keeton and the American Law Institute, "[t]hose constitutional extensions do not appear to have developed definitively at this writing"); *Restatement (Second) of Torts* § 623A, 337 comment c (1977, June 2016 update) ("In the absence of any indications from the Supreme Court on the extent, if any, to which the elements of the tort of injurious falsehood will be affected by the free-speech and free-press provisions of the First Amendment, it is not presently feasible to make predictions with assurance."). Defendant's argument, which simply assumes that constitutional defamation standards apply to all civil actions involving speech or public figures, does not confront that issue.

The second alternative contention proposes an undeveloped absolute privilege defense. Defendant argues:

> "The statement is absolutely privileged because, as a matter of public policy, private citizens and public employees should be encouraged to report unlawful sex discrimination or sexual harassment by high-ranking public officials. It would have a significant chilling effect on such reports if they potentially exposed a complainant to a multimillion dollar lawsuit. This court should not permit individuals to use IIER claims to prevent the public from commenting on matters of public concern, including a public official's fitness for public employment."

That is defendant's entire argument. Defendant cites no controlling or directly relevant legal authority to support the existence of such a privilege. Nor does defendant address how that theory fits into existing case law evincing an understanding of absolute privilege as narrowly limited to judicial and legislative proceedings. *See, e.g., Grubb v. Johnson et al*, 205 Or 624, 631, 289 P2d 1067 (1955) ("The class of absolutely privileged communications is narrow and is practically limited to legislative and judicial proceedings and other acts of state[.]" (Internal quotation marks omitted.)).

The third alternative argument is that plaintiff was required, and failed, to provide evidence capable of defeating defendant's qualified privilege to report plaintiff's misconduct. That argument presents a significant issue of statutory interpretation. It would require us to decide for the first time whether, under ORS 31.150(3), a plaintiff is required to produce evidence capable of defeating affirmative defenses in order meet its *prima facie* burden at the second step of the anti-SLAPP analysis. *See Neumann v. Liles*, 261 Or App 567, 580 n 8, 323 P3d 521 (2014), *rev'd*, 358 Or 706, 369 P3d 1117 (2016) ("We save for another day the question of whether and to what extent ORS 31.150 authorizes parties to litigate affirmative defenses in the context of a special motion to strike."). Defendant fails to grapple with that issue, acknowledging it in a footnote with a single citation to a California case. She does not advance a reasoned analysis under our familiar statutory interpretation framework; there is no discussion of how the text, context, or legislative history of ORS 31.150 evince a legislative intention to require anti-SLAPP plaintiffs to overcome affirmative defenses.

We decline to decide those important statutory and constitutional issues on such thin development and, consequently, do not reach defendant's alternative contentions.

In sum, the trial court erred in concluding that plaintiff failed to establish a probability that he will prevail on the claim by presenting substantial evidence to support a *prima facie* case, and in granting the motion to strike pursuant to ORS 31.150(3).

Reversed and remanded.