354 January 31, 2024 No. 47

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

CIDER RIOT, LLC
and Abram Goldman-Armstrong,
*Plaintiffs-Respondents,*

*v.*

PATRIOT PRAYER USA, LLC;
Joseph "Joey" Gibson; Ian Kramer; Christopher Ponte;
David Willis; and Mackenzie Lewis,
*Defendants-Appellants,*

*and*

Matthew COOPER
and John Does 1-25,
*Defendants.*

Multnomah County Circuit Court
19CV20231; A173013

Andrew M. Lavin, Judge.

Submitted May 7, 2021.

David Willis filed the brief *pro se*.

Mack Lewis filed the brief *pro se*.

Christopher Ponte filed the brief *pro se*.

Ian Kramer filed the brief *pro se*.

James L. Buchal and Murphy & Buchal LLP filed the briefs for appellants Patriot Prayer USA, LLC, and Joseph "Joey" Gibson.

Thomas M. Christ and Sussman Shank LLP; Clifford S. Davidson and Snell & Wilmer LLP; and, Juan C. Chavez and Oregon Justice Center filed the brief for respondents.

Before Kamins, Presiding Judge, Lagesen, Chief Judge, and Jacquot, Judge.

Lagesen, C. J.

Reversed in part; otherwise affirmed.

**LAGESEN, C. J.**

Although "[n]o federal rule of law restricts a State from imposing tort liability for business losses that are caused by violence and threats of violence[,] \*\*\* the presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to damages liability and on the persons who may be held accountable for those damages." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 US 886, 102 S Ct 3409, 73 L Ed 2d 886 (1982). In this case, plaintiffs Cider Riot, LLC, and Goldman-Armstrong seek to recover economic and noneconomic damages for alleged negligence, trespass, intentional infliction of emotional distress (IIED), and intentional interference with economic relations (IIER) from defendants Gibson, Patriot Prayer USA, LLC, Kramer, Ponte, Willis, and Lewis. The individual defendants associate with the group or movement known as Patriot Prayer; plaintiffs are a bar and its owner that associate with, and host others who associate with, the group or movement known as Antifa.[1] The two groups embrace ideologies that are repugnant to each other.[2] The torts are alleged to

---

[1] We refer to Antifa and Patriot Prayer because the evidence presented in the trial court reflects that many, if not all, of the individuals involved in the 2019 events identified as being part of Antifa or Patriot Prayer. Our general references to Patriot Prayer are not references to defendant, Patriot Prayer USA, LLC, and should not be understood to suggest that the individuals who identify with Patriot Prayer are members of the LLC.

[2] Although the record in this case does not permit us to describe with confidence the respective ideologies or structures of Patriot Prayer and Antifa, it does permit us to describe with confidence those groups' respective understandings of each other. According to the allegations in the pleadings and the declarations in the record, those associated with Antifa, short for "anti-fascist," view those associated with Patriot Prayer as right-wing extremists, supporting fascism, white nationalism, and xenophobia. *See also Cantu v. City of Portland*, No. 3:19CV-01606-SB, 2020 WL 2952972 at \*1 (D Or June 3, 2020) (noting that counter-protestors of a Patriot Prayer rally describe Patriot Prayer as "far-right extremists" who rally for the causes of white supremacy, white nationalism, and xenophobia"). Those associated with Patriot Prayer view those associated with Antifa as left-wing extremists, supporting communism and socialism. *See also Kessler v. City of Charlottesville*, 441 F Supp 3d 277, 282 (W D Va Feb 21, 2020) (stating that a member of Unite the Right describes Antifa as espousing "violent rhetoric against Alt-right and politically conservative" speakers and ideas). Each group perceives the other, and what the other stands for, to be a dire threat to their own view of democracy and American values. Each group, in addition, views the other as supporting violence as a means to achieving its goals. The latter perspective has a basis in fact; the record also contains evidence demonstrating that some individuals associated with each group have engaged in acts of violence,

have occurred (1) when the individual defendants went to the bar where, from the public sidewalk, they engaged with bar patrons associated with Antifa; and (2) through certain online postings made by defendant Gibson. Defendants filed special motions to strike under ORS 31.150(2)(c) and (d),[3] asserting that plaintiffs' claims arose out conduct or statements entitled to First Amendment protection. The trial court denied those motions, entering limited judgments on the denial required by ORS 31.150(1). Defendants have appealed those judgments. For the reasons that follow, we affirm as to defendants Kramer, Ponte, Willis, and Lewis, reverse with respect to defendant Patriot Prayer USA, LLC, and reverse in part with respect to defendant Gibson.

## I.   LEGAL FRAMEWORK

This case is before us on review of the trial court's denial of defendants' special motions to strike under Oregon's anti-SLAPP statute, ORS 31.150. The legislature enacted that statute to protect defendants from lawsuits targeting their exercise of protected First Amendment rights. *See Staten v. Steel*, 222 Or App 17, 30, 191 P3d 778 (2008), *rev den*, 345 Or 618 (2009) (internal citations and quotation marks omitted). As explained further below, although plaintiffs' theory of liability is imprecise, plaintiffs generally seek to hold defendants liable in tort (1) for their roles in a political protest of plaintiffs' business that resulted in violent interactions between plaintiffs' patrons and some defendants, and (2) for certain online comments made by some defendants about plaintiffs' business, including online comments encouraging readers to report any complaints they had about plaintiffs' business to the Oregon Liquor Control Commission (OLCC).[4] To provide

---

and have threatened acts of violence, toward individuals associated with the other group.

[3] ORS 31.150 was renumbered, effective January 1, 2024. *See* Or Laws 2023, ch 71, § 1. The amendment to the statute has no bearing on our decision because we apply the law in effect at the time of the trial court's decision. *Peters v. C21 Investments, Inc.*, 322 Or App 462, 465, 520 P3d 920 (2022). Accordingly, all references to ORS 31.150 are to the statute as it existed when the trial court denied defendants' motion to strike.

[4] When the events at issue in this case arose in 2019, OLCC stood for "Oregon Liquor Control Commission." The Oregon legislature changed the name of the agency to "Oregon Liquor and Cannabis Commission," effective August 2, 2021. *See* Or Laws 2021, ch 351, § 1. This change of name has no bearing on our decision.

context for the parties' arguments, and our analysis of them, we provide an overview of Oregon's anti-SLAPP procedures, and the applicable First Amendment standards, before turning to the primary question before us: whether, with respect to defendants Gibson and Patriot Prayer USA, LLC, plaintiffs have presented a *prima facie* case that those defendants engaged in conduct for which the First Amendment permits the imposition of tort liability.

A.   *Oregon's Anti-SLAPP Statutes*

The Oregon legislature enacted Oregon's anti-SLAPP statutes to protect defendants against strategic lawsuits intended to quash the exercise of First Amendment rights. *See Staten*, 222 Or App at 30 (explaining history of the statute). The purpose of the provisions is "to provide for the dismissal of claims against persons participating in public issues *** before the defendant is subject to substantial expenses in defending against them." *Id*. at 29. To that end, ORS 31.150 authorizes a defendant in a civil action to file a special motion to strike any claim arising out of protected speech and conduct:

> "A special motion to strike may be made under this section against any claim in a civil action that arises out of:
>
> "(a)   Any oral statement made, or written statement or other document submitted, in a legislative, executive or judicial proceeding or other proceeding authorized by law;
>
> "(b)   Any oral statement made, or written statement or other document submitted, in connection with an issue under consideration or review by a legislative, executive or judicial body or other proceeding authorized by law;
>
> "(c)   Any oral statement made, or written statement or other document presented, in a place open to the public or a public forum in connection with an issue of public interest; or
>
> "(d)   Any other conduct in furtherance of the exercise of the constitutional right of assembly, petition or association or the constitutional right of free speech or freedom of the press in connection with a public issue or an issue of public interest."

ORS 31.150(2). This case, as discussed further below, implicates ORS 31.150(2)(d). Plaintiffs' claims arise out of

defendants' activities protesting plaintiffs' business because of plaintiffs' association with particular viewpoints, conduct in furtherance of defendants' constitutional rights of assembly, association, and free speech.

A defendant wishing to invoke the protections of ORS 31.150 with respect to a claim or claims may file a special motion to strike within 60 days of service of the complaint or later, with the court's permission. ORS 31.152(1). As with motions to dismiss under ORCP 21, a defendant must file a special motion to strike before filing an answer. *Horton v. Western Protector Insurance Company*, 217 Or App 443, 453, 176 P3d 419 (2008).

A moving defendant bears "the initial burden of making a prima facie showing that the claim against which the motion is made arises out of a statement, document or conduct described in" ORS 31.150(2). ORS 31.150(3). Once a court determines that the defendant has made the necessary showing, "the burden shifts to the plaintiff in the action to establish that there is a probability that the plaintiff will prevail on the claim by presenting substantial evidence to support a prima facie case." ORS 31.150(3). To establish a *prima facie* case on a particular claim, a plaintiff must produce evidence sufficient to permit a reasonable factfinder to find in the plaintiff's favor on the claim. *Handy v. Lane County*, 360 Or 605, 622-23, 385 P3d 1016 (2016) (explaining plaintiff's burden of production in the context of a special motion to strike); *Snook v. Swan*, 292 Or App 242, 246-47, 423 P3d 747 (2018) (explaining that a plaintiff must produce evidence sufficient to permit a reasonable factfinder to find that plaintiff proved the elements of their claim) (citing *Wingard v. Oregon Family Council, Inc.*, 290 Or App 518, 522-23, 417 P3d 545, *rev den*, 363 Or 119 (2018)).

In evaluating special motions to strike under ORS 31.150, "we 'liberally' construe the statute 'in favor of the exercise of the rights of expression' it protects." *DeHart v. Tofte*, 326 Or App 720, 725, 533 P3d 829, *rev den*, 371 Or 715 (2023) (quoting ORS 31.152(4)); *see also C.I.C.S. Employment Services v. Newport Newspapers*, 291 Or App 316, 320, 420 P3d 684 (2018) (so stating). Consistent with that statutory purpose, the Oregon Supreme Court has recognized that

where a claim rests on speech or conduct in furtherance of the rights of petition, assembly, or association, it is proper for a court to strike or dismiss the claim if the statements or conduct on which the claim rests are protected by the First Amendment and, therefore, not actionable. *See Neumann v. Liles*, 358 Or 706, 708, 722, 724, 369 P3d 1117 (2016) (holding that, in ruling on special motion to strike, trial court properly dismissed defamation claim because claim was predicated on statements that were protected by the First Amendment); *see also Campos v. Jensen*, 296 Or App 402, 408, 414-15, 439 P3d 540 (2019) (under *Neumann*, trial court correctly granted the special motion to strike the plaintiff's claims for defamation and invasion of privacy where statements on which claims rested were not actionable under the First Amendment); *cf. Davoodian v. Rivera*, 327 Or App 197, 215-16, 535 P3d 309 (2023) (holding that, where a claim for intentional infliction of emotional distress rested on privileged statements that were not actionable, the defendant's special motion to strike should have been granted). We proceed to discuss the applicable First Amendment standards.

B.   *First Amendment Standards*

1.   *Standards for imposition of liability arising out of protest activity.*

The United States Supreme Court has recognized that the First Amendment rights to free assembly, association, and speech afford broad protection to protest activity. That protection means a state's ability to impose liability—civil or criminal—in connection with such activity is limited. Part of the rationale for this broad protection is to ensure that protests against the government or "prevailing social order" are not chilled by the potential for liability. *See, e.g.*, *Counterman v. Colorado*, 600 US 66, 75, 81, 143 S Ct 2106, 216 L Ed 2d 775 (2023) (explaining rationale for strong protections of speech activity, including requirement of a subjective culpable mental state for imposition of liability). As the Court recently explained,

> "Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries. A speaker may be unsure about the side of the line on which his speech falls. Or he may worry that the legal system will err, and count speech

that is permissible as not. Or he may simply be concerned about the expense of becoming entangled in the legal system. \*\*\* The result is self-censorship of speech that could not be proscribed—a cautious and restrictive exercise of First Amendment freedoms.

*Id.* at 75 (internal quotation marks omitted).

The Supreme Court's decision in *Claiborne Hardware* sets the standards for imposition of tort liability in connection with the activity of protesting or boycotting private businesses. *See* 458 US at 915-17 (explaining that "nonviolent elements of petitioners' [boycott] activities are entitled to the protection of the First Amendment," and, further, that "the presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to damages liability and on the persons who may be held accountable for those damages"); *see also Schumacher v. City of Portland*, No CV 07-601-MO, 2007 WL 9809070, at \*3 (D Or Sept 20, 2007) (applying *Claiborne Hardware* to grant individual defendant's special motion to strike fur business's claim of intentional interference with business relations arising out of protest of business). Because that case is central to defendants' arguments, was central to the trial court's ruling and, ultimately, frames our assessment of whether plaintiffs established a *prima facie* case against two of the individual defendants, we discuss it in detail.

In *Claiborne Hardware*, the Court was called upon to address the extent to which individual organizers and participants in a seven-year boycott, from 1966 through 1972, of white merchants in Port Gibson and Claiborne County, Mississippi, could be held liable in tort for the business damages suffered by the merchants. 458 US at 888-89, 896. The purpose of the boycott was to secure equal civil rights for Black people in the community. *Id.* at 899, 907. The organizers made 19 specific demands on the leaders of their town and county, including that schools be desegregated, that Blacks be permitted to serve on juries, that bus stations be integrated, and that verbal abuse by police officers end. *Id.* at 899-900. After government officials failed to honor those demands, the seven-year boycott began. *Id.* at 900.

The boycotted merchants eventually filed suit against participants in the boycott, seeking to recover their business losses. *Id*. at 889. As relevant here, the state courts had concluded that boycott participants could be liable for malicious interference with the plaintiffs' businesses, rejecting the defendants' contention that the First Amendment precluded liability for their conduct. *Id*. at 890-91, 895. Ultimately, the Court disagreed with the state courts, holding that "the nonviolent elements of petitioners' activities are entitled to the protection of the First Amendment." *Id*. at 915. It then turned to the question of who, among the participants, could be held liable for the violent elements of the activities, and the applicable standards for assessing whether particular conduct gave rise to tort liability.

In reaching its conclusion, the Court noted, the boycott involved a range of conduct. Some of that conduct was peaceable and involved primarily speech and assembly:

> "The boycott of white merchants at issue in this case took many forms. The boycott was launched at a meeting a local branch of the NAACP attended by several hundred persons. Its acknowledged purpose was to secure compliance by both civic and business leaders with a lengthy list of demands for equality and racial justice. The boycott was supported by speeches and nonviolent picketing. Participants repeatedly encouraged others to join in its cause."

*Id*. at 907. Some of the speeches were, at times strongly worded and suggested that persons who violated the boycott would be punished. *Id*. at 937-38. For example, when speaking after local police officers shot and killed a young Black man, Charles Evers, the Mississippi Field Secretary for the NAACP, gave a speech in which he stated, among other things, that "if you be disobedient now you are going to be in trouble," that "you better not be caught on these streets shopping in these stores until" the boycotters' demands were met. *Id*. at 934-40.

Additionally, "[i]ndividuals stood outside of boycotted stores and identified those who traded with the merchants." *Id*. at 903. Some of those individuals wore black hats and became identified as the "Black Hats." *Id*. The names of people who traded with the boycotted merchants

were then read at meetings of the Claiborne County NAACP and "published in a mimeographed paper entitled the 'Black Times.'" *Id*. at 903-04. Those "persons 'were branded as traitors to the black cause, called demeaning names, and socially ostracized merely for trading with whites.'" *Id*. at 904 (quoting the findings of the Mississippi trial court).

That particular speech and conduct, the Court explained, ordinarily was constitutionally protected by the First and Fourteenth Amendments and could not supply a basis for tort liability. *Id*. at 908-15. On the other hand, the boycott also involved acts of violence that were not protected by the First Amendment. *Id*. at 915-16. As a result, the Court was required to "consider here the effect of [its] holding that much of petitioners' conduct was constitutionally protected on the ability of the State to impose liability for elements of the boycott that were not so protected." *Id*. at 916.

In addition to that protected conduct, the Court identified 10 incidents of violence, destruction, and theft directed at boycott violators. *Id*. at 904-05. As recounted by the Court, in three instances, shots were fired at homes. *Id*. at 904-05. A brick was thrown through a windshield. *Id*. at 904. A flower garden was damaged. *Id*. An NAACP member took a Black man's bottle of whiskey because the man had purchased it from "a white-owned store." *Id*. at 905. An elderly brick mason was physically assaulted for not obeying the boycott. *Id*. Another man who declined to participate in the boycott had his truck tires slashed, although the man had never been threatened directly for not participating. *Id*. at 905-06. Another man and his wife received a threatening phone call, and on another occasion, the man was told that he would be whipped for purchasing gas from the wrong place. *Id*.at 906.

The Court concluded that the imposition of tort liability for unlawful conduct occurring in the midst of speech and conduct protected by the First Amendment requires a carefully calibrated analysis:

> "No federal rule of law restricts a State from imposing tort liability for business losses that are caused by violence and by threats of violence. When such conduct occurs in the context of constitutionally protected activity, however,

'precision of regulation' is demanded. Specifically, the presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to damages liability and on the persons who may be held accountable for those damages."

*Id*. at 916-17 (internal citations omitted).

Because the Mississippi courts had not engaged in that "carefully calibrated" analysis with respect to the conduct of the individual defendants, the Court's first step toward resolving the case was to identify the particular facts contended to supply the basis for imposition of liability on each defendant. *Id*. at 918-22. Following oral argument, the Court requested and received briefing on the specific acts committed by each defendant alleged to give rise to damages. *Id*. at 896. In their briefing, the plaintiffs identified four categories of conduct that, in their view, allowed for the imposition of tort liability in connection with the boycott. First, the plaintiffs contended that individuals who managed the boycott by participating in or leading the regular Tuesday night NAACP meetings at which the boycott was discussed could be liable. *Id*. at 897. Second, the plaintiffs contended that individuals, including the "Black Hats," who acted as "enforcers" by watching the boycotted stores and taking the names of boycott violators could be liable. *Id*. Third, the plaintiffs contended that individuals who committed acts of violence, or threatened acts of violence, could be liable. *Id*. at 897-98. Finally, the plaintiffs contended that Charles Evers and the national NAACP could be liable because Evers "'threatened violence on a number of occasions against boycott breakers,'" and because Evers was acting in his capacity as the Field Secretary for the national NAACP when he made the (alleged) threats. *Id*. at 898 (quoting the decision of the Mississippi trial court).

Considering those categories, the Court concluded that most did not allow for the imposition of liability. The court noted:

"Civil liability may not be imposed merely because an individual belongs to a group, some members of which committed acts of violence. For liability to be imposed by reason of association alone, it is necessary to establish that the group

itself possessed unlawful goals and that the individual had the specific intent to further those illegal aims."

*Id*. at 920. It then concluded "that on the present record no judgment may be sustained against most of the petitioners." *Id*. at 924.

With respect to the individuals who participated in weekly meetings, the Court concluded that there was no evidence "that any illegal conduct was authorized, ratified or even discussed at any of the meetings." *Id*. That meant that those individuals could not be held liable in tort for the damages to the boycotted businesses:

> "To impose liability for presence at the weekly meetings of the NAACP would—ironically—not even constitute 'guilt by association,' since there is no evidence that the association possessed unlawful aims. Rather, liability could only be imposed on a 'guilt *for* association' theory. Neither is permissible under the First Amendment."

*Id*. at 925 (emphasis in original).

With respect to the store watchers and "Black Hats," the Court concluded that the conduct of "standing outside a store and collecting names" was not unlawful and could not support liability. *Id*. Neither could the conduct of wearing black hats, notwithstanding the apprehension it caused: "Similarly, there is nothing unlawful in wearing black hats, although such apparel may cause apprehension in others." *Id*. To the extent the plaintiffs' theory was that those individuals were associated with groups containing individuals who committed violent acts, the Court reiterated that "mere association with [a] group—absent a specific intent to further an unlawful aim embraced by that group—is an insufficient predicate for liability." *Id*. at 925-26.

With respect to individuals who engaged in violence or threats of violence, the Court acknowledged that some individual members of the store watchers and "Black Hats" engaged in violence or threats of violence and explained that "these individuals may be held responsible for the injuries they caused; a judgment tailored to the consequences of their unlawful conduct may be sustained." *Id*. at 926.

Finally, the Court addressed separately the question of whether Evers and the national NAACP could be held liable for damages resulting from the boycott, based on their leadership and organization roles. The Court ultimately concluded that there was no basis for liability.

The Court first concluded that there was no basis for imposing liability on Evers based on his role in organizing and leading the boycott:

> "[L]iability may not be imposed on Evers for his presence at NAACP meetings or his active participation in the boycott itself. To the extent that Evers caused respondents to suffer business losses through his organization of the boycott, his emotional and persuasive appeals for unity in the joint effort, or his 'threats' of vilification or social ostracism, Evers' conduct is constitutionally protected and beyond the reach of a damages award."

*Id.* at 926.

The Court next considered—and rejected—the plaintiffs' arguments that Evers, and the national NAACP, could be held liable based on the violent acts of other individuals, because of Evers's "highly charged" speeches which had, among other things, made "references to the possibility that necks would be broken." *Id.* at 927. The Court identified three possible bases for holding Evers liable for the violent conduct of other individuals:

> "First, a finding that he authorized, directed, or ratified specific tortious activity would justify holding him responsible for the consequences of that activity. Second, a finding that his public speeches were likely to incite lawless action could justify holding him liable for unlawful conduct that in fact followed within a reasonable period. Third, the speeches might be taken as evidence that Evers gave other specific instructions to carry out violent acts or threats."

*Id.* Analyzing the record, the Court concluded that the evidence would not support a conclusion that any of those standards was satisfied.

Addressing whether Evers's speeches could support liability, the Court reiterated its holding in *Brandenburg v. Ohio*, 395 US 444, 89 S Ct 1827, 23 L Ed 2d 430 (1969): "This

Court has made clear, however, that the mere *advocacy* of the use of force or violence does not remove speech from the protection of the First Amendment." *Claiborne Hardware Co.*, 458 US at 927. Rather, liability may be imposed based on such speech only "where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg*, 395 Or at 447.[5] "When such appeals do not incite lawless action, they must be regarded as protected speech." *Claiborne Hardware Co.*, 458 US at 928. The Court then concluded that Evers's "emotionally charged rhetoric * * * did not transcend the bourns of protected speech set forth in *Brandenburg*." *Id*. The Court also concluded that the speeches, on their own, could not be used to demonstrate that Evers "authorized, ratified, or directly threatened acts of violence," in the absence of other evidence that Evers had done so. *Id*. at 929. And the Court concluded that there was no evidence that Evers had authorized, ratified, or directed any specific tortious activity. *Id*.

Finally, the Court held that there was no basis to impose tort liability on the NAACP. *Id*. at 930. To the extent the Mississippi courts based the NAACP's liability on Evers's conduct, their judgment could not be sustained because there was no basis for imposing liability on Evers. *Id*. Beyond that, the Court noted that "[t]o impose liability without a finding that NAACP authorized—either actually or apparently—or ratified unlawful conduct would impermissibly burden the right of political association that are protected by the First Amendment." *Id*. at 931.

In summary, under *Claiborne Hardware*, the First Amendment does not permit the imposition of liability for participation in, and organization of, protest activity on behalf of a group, absent evidence of a specific intent to advance an unlawful aim of the group. That is so even when some members engage in violent or otherwise unlawful conduct. The First Amendment also does not permit the imposition of liability for nonviolent, lawful conduct in furtherance of a protest of a business even when that conduct causes the business to suffer losses. The First Amendment does

---

[5] In *Brandenburg*, the Court reversed the conviction of a Ku Klux Klan leader who, in a speech to a Klan group, urged "revengeance" to counteract the suppression of white people. 395 US at 447.

not permit imposition of liability on an individual who advocates for the protest, even if that advocacy urges unlawful or violent activity unless the *Brandenburg* test for imposition of liability is satisfied. Relatedly, the First Amendment does not permit the imposition of liability of a leader or organizer of protest activity for the torts of individuals participating in the protest, absent evidence that the leader or organizer directed, authorized, or ratified the specific tortious conduct. Notwithstanding those principles, the First Amendment does permit the imposition of liability on individuals for their own violent acts or threatened violent acts.

### 2.   *First Amendment limitations on negligence liability*

For purposes of this case, one final area of First Amendment law warrants discussion. In one claim, plaintiffs seek to hold defendants Gibson and Patriot Prayer, LLC, liable under a negligence theory: that Gibson's speech and related conduct created a foreseeable risk of harm to plaintiffs' business by other individuals. In *Counterman*, though, the Supreme Court clarified what type of mental state is required to hold a person civilly or criminally liable when the First Amendment is implicated, even if the individual's speech or conduct ultimately falls outside the protection of the First Amendment. In so doing, the Court held that liability may not be imposed under a negligence standard.

At issue in *Counterman* was the minimum mental state required for the imposition of liability for threats. The Court explained that although threats are not entitled to First Amendment protection, the Court's case law affords "'strategic protection'" to unprotected speech so as to steer wide of the chilling effect created by the potential for civil or criminal liability. *Counterman*, 600 US at 75 (quoting *Gertz v. Robert Welch, Inc.*, 418 US 323, 342, 94 S Ct 2997, 41 L Ed 2d 789 (1974)). One component of that strategic protection "is to condition liability on the State's showing of a culpable mental state." *Id*. Further, to provide adequate protection, the culpable mental state must be a subjective one: "[T]he First Amendment precludes punishment, whether civil or criminal, unless the speaker's words were intended (not just likely) to produce imminent disorder." *Id*. at 76 (citing, among other cases, *Brandenburg*, 396 US at 447 and

*Claiborne Hardware Co.*, 458 US at 927-29 (internal quotation marks omitted)). An objective mental state standard is not permissible because it creates the risk of self-censorship. *Id*. at 77-78. For that reason, the First Amendment forbids the use of a negligence standard for the imposition of liability based on speech that, itself, is not entitled to First Amendment protection. *Id*. at 79 n 5. Ultimately, the Court concluded that recklessness was a constitutionally sufficient mental state for the imposition of liability for threats under the circumstances at issue in *Counterman*. *Id*. at 79-81.

On this point, we acknowledge that the Fifth Circuit, in a divided decision issued 11 days before *Counterman*, reached a different conclusion as to whether the First Amendment permits the imposition of tort liability for negligence in organizing or leading protest activity. In *Doe v. Mckesson*, 71 F4th 278 (5th Cir 2023), that court considered whether Mckesson, the leader of a Black Lives Matter protest in Baton Rouge, Louisiana, could be liable under a negligence theory for serious injuries sustained by a police officer when an unidentified protester—not Mckesson—threw a rock or similar projectile which hit the officer in the face. *Mckesson*, 71 F4th at 281-84. The majority opinion held that the leader could be liable in negligence to the officer for "organiz[ing] and direct[ing] the protest in an unreasonably dangerous manner [that] caused the violent encounter that led to [the officer's] injuries," rejecting Mckesson's arguments that the First Amendment, as construed in *Claiborne Hardware*, precluded the imposition of liability on a protest leader for the violent conduct of another, unless the *Claiborne Hardware* standards were met. *Id*. at 295.

The dissenting opinion agreed with Mckesson that, under *Claiborne Hardware*, Mckesson could not be liable for the unidentified protester's violent act because Mckesson did not "stray from lawfully exercising his own rights." *Id*. at 300 (Willett, J., concurring in part and dissenting in part). Apart from concluding that Mckesson's own activities did not fall within the categories for which *Claiborne Hardware* permits imposition of liability, the dissenting opinion also concluded that the First Amendment does not permit the imposition of liability for a third party's violence under a

negligence standard: "[A] protest leader's simple negligence is far too low a threshold for imposing liability for a third party's violence." *Id.* at 306 (Willett, J, concurring in part and dissenting in part). The dissenting opinion, instead, read *Claiborne Hardware* to require a higher-level mental state because of how a negligence theory of liability "would have enfeebled America's street-blocking civil rights movement, imposing ruinous financial liability against citizens for exercising core First Amendment freedoms." *Id.* at 313 (Willett, J., concurring in part and dissenting in part). The dissenting opinion explained:

> "Holding Mckesson responsible for the violent acts of others because he 'negligently' led a protest that carried the *risk* of *potential* violence is impossible to square with Supreme Court precedent holding only tortious activity meant to incite imminent violence, and likely to do so, forfeits constitutional protection against violent acts committed by others."

*Id.* (emphasis in original). Thus, the dissenting opinion concluded, the First Amendment does not allow for the imposition of liability on a protest leader based on the violent conduct of a protest participant absent some showing that the protest leader committed an intentional tort: "Summing up: McKesson is not liable for intentional violence, foremost because he did not commit any violence, but at a minimum because he did not commit any intentional tort." *Id.* at 313.

As noted, the Supreme Court decided *Counterman* shortly after the Fifth Circuit's decision in *Mckesson*. In its decision, the Court unequivocally rejected a negligence standard for the imposition of liability arising out of speech because such a standard would not adequately insulate the core freedoms protected by the First Amendment from the chilling effect of potential liability. In view of *Counterman*, we are persuaded that the dissenting opinion in *Mckesson* was correct to conclude that the First Amendment does not allow for the imposition of liability on a protest leader or an organizer under a negligence theory.[6]

---

[6] As of this writing, a petition for a writ of certiorari to the United States Court of Appeals for the Fifth Circuit is pending in the United States Supreme Court. *See Mckesson v. Doe*, No. 23-373.

## II.   FACTUAL BACKGROUND

Having provided an overview of Oregon's anti-SLAPP procedures and the limitations that the First Amendment places on the imposition of liability for speech and protest activities, we turn to the facts of this case.

Plaintiff Cider Riot, LLC, is a brewery and bar in Northeast Portland. Plaintiff Goldman-Armstrong is its owner and operator. This tort case arises, for the most part, out of a 2019 clash between patrons of Cider Riot, who are associated with Antifa, and, among others, defendants Gibson, Kramer, Ponte, Willis, and Lewis, all of whom are associated with a group or movement known as Patriot Prayer. Defendant Patriot Prayer USA, LLC, is a limited liability company owned entirely by Gibson. It has no members other than him. Those who identify with Patriot Prayer hold starkly divergent views from those who identify with Antifa. Those divergent views have generated immense hostility, which has led to confrontations, which has resulted in violence between those holding opposing views.

The clash at the heart of this case began as a heated exchange of political viewpoints between defendants, who were on public property adjacent to the brewery and bar, and plaintiffs' patrons, many of whom were sitting in the bar's outdoor seating area. Ultimately, the verbal dispute escalated into some physical confrontations. This resulted in injuries to some of plaintiffs' patrons and, plaintiffs allege, a range of economic and noneconomic losses. Several days after the incident, Gibson urged people to report Cider Riot to the OLCC. Other individuals made online comments disclosing the names and addresses of plaintiffs' business partners.

For their involvement in that clash, encouraging complaints to the OLCC, and identifying plaintiffs' business partners, plaintiffs seek to hold all defendants liable for four torts: negligence, trespass, intentional infliction of emotional distress, and intentional interferences with economic relations.

Defendants Kramer, Ponte, Willis, and Lewis all filed answers to the complaint. Defendants Gibson and

Patriot Prayer USA, LLC, responded differently, filing special motions to strike under ORS 31.150, Oregon's "anti-SLAPP" statute.[7] Their theory was that plaintiffs would not be able to meet the First Amendment standard, established in *Claiborne Hardware Co.*, governing the imposition of tort liability arising out of protected political protest activity. After Gibson and Patriot Prayer USA, LLC, filed their motion, Kramer, Ponte, Willis, and Lewis also filed special motions to strike.

The trial court denied the motions filed by defendants Kramer, Ponte, Willis, and Lewis as untimely. It denied the motion filed by defendants Gibson and Patriot Prayer USA, LLC, concluding that, as required by ORS 31.150(3), plaintiffs had put forth sufficient evidence to make a *prima facie* case for tort liability, especially when the *Claiborne Hardware* standard is taken into account. The court explained:

> "In their complaint, plaintiffs allege four claims: Negligence, trespass, intentional infliction of emotional distress, and intentional interference with economic relations.
>
> "The majority of the facts that the plaintiffs allege in support of those claims occurred on May 1st of this year in an area immediately surrounding the premises of Cider Riot.
>
> "Both plaintiffs and defendants have submitted affidavits and video evidence that describe and depict those events. No single piece of video evidence or affidavit tells the whole story of what happened outside of Cider Riot on May 1st.
>
> "And taken together, the evidence as a whole paints a picture that is somewhat ambiguous in certain ways and subject to multiple and competing interpretations, each of which is arguably reasonable.
>
> "From that evidence, could a reasonable trier of fact conclude that it is more likely than not that certain individuals outside Cider Riot on May 1st engaged in conduct that went beyond Constitutionally protected speech or demonstration and therefore became tortious or criminal?

---

[7] *See Handy v. Lane County*, 360 Or 605, 612, n 4, 385 P3d 1016 (2016) (explaining anti-SLAPP suits).

"And the answer to that is yes, a reasonable trier of fact could find that. The parties have presented direct evidence that would support such a conclusion; specifically, the plaintiffs have presented direct evidence to that effect.

"Could a reasonable trier of fact conclude that, more likely than not, Joey Gibson personally engaged in physical conduct of that kind? No, I don't think so, not from the evidence that I have seen.

"Finally, could a reasonable trier of fact conclude, on a more likely than not basis, that Joey Gibson and Patriot Prayer are liable for the tortious and/or criminal conduct of the other individuals outside Cider Riot on May 1st because Gibson and Patriot Prayer somehow ratified, coordinated or directed that conduct?

"I found that to be a more difficult question to answer than the others. If there is any direct evidence of ratification, coordination or direction, it is scant at best.

"However, I conclude that plaintiffs have presented sufficient circumstantial evidence from which a reasonable trier of fact could infer that Gibson and Patriot Prayer ratified, coordinated or directed the tortious and criminal behavior of others at Cider Riot on May 1st, thereby becoming liable for their conduct.

"On the other hand, could a reasonable trier of fact conclude otherwise? Specifically, could a reasonable trier of fact conclude that it is not more likely that the defendants ratified, coordinated or directed the conduct of other present? Yes, I believe so.

"Nevertheless, the standard that I am to apply today does not require certainty as to the—as to an outcome in plaintiffs' favor in order for plaintiffs to defeat defendants' special motion to strike."

The trial court then entered a limited judgment denying all the motions, as required by ORS 31.150(1). Defendants appealed.

On appeal, defendants Gibson and Patriot Prayer USA, LLC, argue that the trial court erred when it concluded that plaintiffs had established a *prima facie* case for tort liability against them under the standards set forth in *Claiborne Hardware*. Defendants Kramer, Ponte, Willis,

and Lewis argue that the trial court erred in denying their motions to strike as untimely.

In response, plaintiffs first raise an issue with the record. They point out that defendant Gibson relies, in part, on videos that his lawyer played at the hearing on the motion to strike, but that were not formally offered into evidence. Although the Appellate Commissioner granted Gibson's motion to supplement the record on appeal with the videos, plaintiffs argue that ruling was in error and that the court cannot rely on the videos for that reason. Plaintiffs also argue that we cannot look to the videos because the transcript of the hearing on the motion to strike does not reflect what particular portions of the videos the trial court watched. In addition, plaintiffs argue that under the procedural standards that govern special motions to strike under ORS 31.150, we are foreclosed from considering defendant's video evidence in assessing whether plaintiffs have made a sufficient *prima facie* case on each of their claims against defendant.

Next, plaintiffs characterize the special motion to strike filed by defendants Gibson and Patriot Prayer USA, LLC, as challenging the entirety of the complaint, rather than each claim. Specifically, plaintiffs argue that the failure to challenge the viability of each claim means that we must affirm in full if plaintiffs have established a *prima facie* case with respect to any single claim.

Plaintiffs then argue that Gibson and Patriot Prayer USA, LLC, did not establish that plaintiffs' complaint targeted protected activity for purposes of ORS 31.150. Finally, plaintiffs assert that their evidence establishes a *prima facie* case for each of their claims against Gibson and Patriot Prayer USA, LLC. Although the trial court decided the case under the *Claiborne Hardware* standard, and defendants Gibson and Patriot Prayer USA, LLC, have thoroughly briefed the case under the *Claiborne Hardware* standard, plaintiffs do not cite *Claiborne Hardware* in their brief, or engage with it or the trial court's analysis. Rather, plaintiffs somewhat summarily assert that "[t]here is ample evidence from which a jury could find that Gibson went beyond the abstract advocacy that enjoys First Amendment—to find

that he engaged in conduct that was intended to produce, likely to produce, and, indeed, *did* produce imminent acts of lawlessness and violence, and also to find that he engaged in some of that himself."

### III.  STANDARD OF REVIEW

We review a trial court's grant of a special motion to strike for legal error. *Plotkin v. SAIF*, 280 Or App 812, 815, 385 P3d 1167 (2016), *rev den*, 360 Or 851 (2017). In determining whether a plaintiff's evidence is sufficient to establish a *prima facie* case for purposes of ORS 31.150(3), we view the facts in the light most favorable to plaintiff. *Handy*, 360 Or at 608 n 1. That means "we consider plaintiff's evidence and draw the reasonable inferences from that evidence in favor of plaintiff." *Plotkin*, 280 Or App at 815-16. Where there is a factual conflict in the evidence, we adopt the version that is most favorable to plaintiff, as long as it is supported by sufficient evidence. *Id*. at 816. We will consider defendants' opposing evidence "only to determine if it defeats plaintiff's showing as a matter of law." *Id. See also Bryant v. Recall for Lowell's Future Committee*, 286 Or App 691, 692-93, 400 P3d 980 (2017) (so noting). Whether the evidence is legally sufficient to establish that an individual defendant engaged in conduct that is actionable under the First Amendment presents a legal question that we review for legal error. *See generally Claiborne Hardware Co.*, 458 US at 918-34 (so reviewing).

### IV.  ANALYSIS

As noted, the trial court denied the special motions to strike by defendants Kramer, Ponte, Willis, and Lewis for procedural reasons; it denied the special motion to strike by defendants Gibson and Patriot Prayer LLC on the ground that plaintiffs established a *prima facie* case under *Claiborne Hardware*. We address the two sets of defendants separately.

### A.  *Defendants Kramer, Ponte, Willis, and Lewis*

The trial court denied the motions of defendants Kramer, Ponte, Willis, and Lewis because those defendants filed their motions after filing responsive pleadings. Under

*Horton v. Western Protector Insurance Company*, 217 Or App 443, 176 P3d 419 (2008), that ruling is correct. There, we held that that ORS 31.150(1) ultimately requires that "a motion to strike be filed within 60 days after service, or in the court's discretion, at any time later, *only if a responsive pleading has not yet been filed.*" *Id*. at 451 (emphasis in original). Although defendants urge us not to apply that controlling precedent, we are not persuaded. Accordingly, we affirm the judgment of the trial court denying the motions of defendants Kramer, Ponte, Willis, and Lewis as untimely.

B.  *Defendants Gibson and Patriot Prayer USA, LLC*

We turn to the question of whether the trial court correctly concluded that plaintiffs established a *prima facie* case against defendant Gibson and defendant Patriot Prayer USA, LLC, so as to withstand those defendants' properly filed special motion to strike. As mentioned, plaintiffs raise a number of procedural arguments. We address those first, before turning to the question of the sufficiency of plaintiffs' *prima facie* cases against defendant Gibson and defendant Patriot Prayer USA, LLC.

1.  *Procedural arguments*

a.  Scope of the record

In support of their arguments in support of, and opposing, defendants' special motion to strike, all parties relied on affidavits and video evidence, some of which was played during the hearing on the motion.[8] Although the trial court stated on the record that it reviewed the video evidence, and relied on that evidence, together with the affidavits, the trial court record transmitted to our court did not contain all of the video evidence that had been submitted to the trial court. Upon discovering the omission, defendants moved to supplement the record with the omitted video evidence, on which defendants had relied both to argue that plaintiffs' claims implicated ORS 31.150, and to counter plaintiffs' *prima facie* case. Over plaintiffs' objection, the Appellate Commissioner granted the motion. In their brief to us, plaintiffs argue that we should reconsider that ruling

---

[8] Some of the affidavits submitted by plaintiffs referred to video that was viewable on YouTube.

or decline to consider the evidence because it is unclear from the record what specific parts of the videos that the trial court viewed.

We decline to reconsider the commissioner's ruling. Although we recognize that defendants were not able to supply the court with the exact copy of the video evidence that was provided to the trial court, the commissioner permissibly concluded that what defendants provided was what was before the trial court, and plaintiffs' arguments have not persuaded us to displace that conclusion. As for plaintiffs' argument that we should not consider the videos because it cannot be determined what portions of the video the trial court relied on, that argument also does not provide a basis for disregarding the video evidence submitted for and against the special motion to strike. Regardless of whether the trial court viewed all of the video evidence at the hearing, or just a part of it, all of it was submitted to the trial court as a basis for its decision, and there is no indication that the court struck any of the submissions.

Accordingly, in evaluating the parties' arguments on appeal, we have reviewed the evidence in the record, including the video evidence that the commissioner permitted defendants to submit to this court. In considering that evidence when evaluating the sufficiency of plaintiffs' *prima facie* cases, we are mindful of the limitations on how we can employ that evidence. As noted in our statement of the standard of review, where there is a conflict in the evidence, we resolve that conflict in favor of plaintiffs, and consider defendants' evidence only to the extent it defeats plaintiffs' claims as a matter of law. *Plotkin*, 280 Or App at 816.

b.  Specificity of special motion to strike

Plaintiffs also argue that defendants' motion to strike targeted the complaint in its entirety, and did not, as ORS 31.150 requires, target individual claims. They argue further that, if we determine that plaintiffs have made a *prima facie* case for any claim, then we should affirm the denial of the motion to strike in its entirety. Although plaintiffs' argument accurately reflects the analysis we employ when a motion to strike indiscriminately challenges a

multi-claim complaint as a whole, *see Tokarksi v. Wildfang*, 313 Or App 19, 25-26, 496 P3d 22, *rev den*, 368 Or 788 (2021), we disagree that defendants' motion to strike, viewed in its entirety, challenged the entire complaint indiscriminately. Although the motion to strike targeted the complaint as a whole, in their memorandum in support of the special motion to strike, defendants walked through each of the alleged claims and argued that plaintiffs would not be able to establish *prima facie* cases against either defendant Gibson or defendant Patriot Prayer USA, LLC. In their briefing on appeal, defendants have again addressed each claim individually. For that reason, we too analyze the sufficiency of plaintiffs' *prima facie* case with respect to each separate claim against each individual defendant.

2.    *Whether plaintiffs' claims are subject to ORS 31.150*

With respect to the merits of defendants' motion to strike, plaintiffs first argue that ORS 31.150 does not apply to their claims at all and urge us to affirm the trial court's denial of the motion on that alternative ground. As did the trial court, we conclude that defendants established that ORS 31.150 applies to plaintiffs' claims. In particular, with respect both to plaintiffs' claims arising out of the May 1 incident, and to plaintiffs' claims arising out of defendant Gibson's online statements encouraging people to report plaintiffs to the OLCC, those claims arise out of "conduct in furtherance of the exercise of the constitutional right of assembly * * *or association * * * or the constitutional right of free speech * * * in connection with a public issue or an issue of public interest." ORS 31.150(2)(d).

The claims arising out of the May 1 incidents arise out of defendant Gibson's participation in a collective protest of plaintiffs' business and its association with Antifa, which is conduct in furtherance of the constitutional rights of association, assembly, and free speech, as *Claiborne Hardware* illustrates. 458 US at 932-33. As for defendant Gibson's posting of online statements encouraging people to report plaintiffs' business to the OLCC, that conduct, too, falls within ORS 31.150(2)(d). *See Neumann*, 295 Or App at 344-46 (concluding that online reviews of wedding venue constituted conduct covered by ORS 31.150(2)(d), as it was speech

on a matter of public interest). As an establishment serving alcohol, plaintiff Cider Riot was subject to regulation by the OLCC, and commenting to the OLCC on its licensee, and urging other members of the public to make comments to the OLCC about a licensee constitutes conduct in further-ance of the right to petition the government. The trial court correctly concluded that plaintiffs' claims against defen-dants Gibson and Patriot Prayer USA, LLC, are subject to ORS 31.150.

    3.  Prima facie *case against the LLC*

        We first consider whether plaintiffs have estab-lished a *prima facie* case against Patriot Prayer USA, LLC. As noted, defendant Gibson is the sole member, owner, and employee of the LLC. He created the LLC for the purpose of accepting donations to assist his activities, including his activities opposing Antifa. In their brief on appeal—much as was the case below—plaintiffs have not identified any specific conduct by Patriot Prayer USA, LLC, that would support the imposition of liability on any of the four claims alleged in the complaint. Instead, they argue that "[f]or all intents and purposes, Gibson and the LLC are one and the same." They also assert that Patriot Prayer USA, LLC, is vicariously liable for Gibson's activities "under the doctrine of *respondeat superior.*" And they assert that "Gibson didn't argue below that the LLC is not liable for his torts, so that argument isn't preserved for this court's review."

        We conclude that plaintiffs have not met their burden under ORS 31.150 to establish a *prima facie* case against the LLC. As defendants point out, Gibson and the LLC jointly filed the motion to strike the claims against them, and argued that plaintiffs would not be able to estab-lish a *prima facie* case with respect to either defendant as to any claim. Once the trial court determined that the claims alleged in the complaint were subject to ORS 31.150, it was plaintiffs' burden to put forth a *prima facie* case with respect to each claim and each defendant. ORS 31.150(3); *Handy*, 360 Or at 622-23. Plaintiffs did not do so with respect to the LLC. They did not produce any evidence that would permit a reasonable factfinder to determine that the LLC engaged in tortious conduct, and they did not produce evidence that

would permit the imposition of liability on the LLC under either an alter ego theory or a vicarious liability theory. *See Rowden v. Hogan Woods, LLC*, 306 Or App 658, 679-82, 476 P3d 485 (2020) (stating the standards for treating an LLC as an alter-ego of a member or manager); *see also Harkness v. Platten*, 359 Or 715, 734, 375 P3d 521 (2016) (stating standards for imposition of vicarious liability). Accordingly, the special motion to strike should have been granted as to all claims with respect to the LLC.

4.   Prima facie *case against defendant Gibson*

Finally, we turn to the question whether plaintiffs have established a *prima facie* case against defendant Gibson on any of their four claims. Our resolution of this question has been hindered, to some degree, by plaintiffs' failure to engage with the analysis of the trial court or with the *Claiborne Hardware* standard. Rather than identify with precision the specific conduct on which their claims against defendant Gibson rest, plaintiffs, in the main, argue that Gibson is liable for harms resulting from the events of May 1 as a result of his leadership role and his presence at Cider Riot on that day. Despite that lack of precision, we nonetheless review the record, as did the trial court, to determine whether it evidences conduct by Gibson that would permit the imposition of tort liability consistent with the First Amendment. As noted above, in conducting our review of the record we have reviewed the video evidence as well as the declarations, and, in the main, agree with the trial court's assessment of the evidence. That evidence, particularly the video evidence, when the May 1 encounter is viewed in its entirety, does not tend to indicate any violent conduct by Gibson himself, although it does evidence violent conduct both by persons apparently associated with Patriot Prayer, and by persons associated with Antifa or with plaintiffs. Plaintiffs' declarations tend to suggest a much more violent event on May 1 than the video reflects. Although we are mindful of our standard of review, and we resolve disputes of fact in favor of plaintiffs' version of events, where the declarations in support of plaintiffs' case rest on broad and conclusory characterizations of the events in question, rather than specific assertions of fact, we consider those

allegations in the light that the video sheds on them in assessing plaintiffs' claims that defendant Gibson engaged in conduct that is actionable under the First Amendment. Doing so, we believe, is consistent with our obligation under ORS 31.152 to "liberally construe[]" the provisions of the anti-SLAPP statutes "in favor of the exercise of the rights described in ORS 31.150(2)." *DeHart*, 326 Or App at 725; ORS 31.152(4).

    a.  Negligence

    Plaintiffs' first claim against Gibson is negligence. The gravamen of that claim is that Gibson's prolific and well-publicized activities opposing Antifa created a foreseeable risk of harm to plaintiffs when "Gibson coordinated with Patriot Prayer members to arrive at Cider Riot" to "[t]ake the fight to Antifa." Plaintiffs allege that "[g]iven the repeated extreme incitements of violence against perceived political enemies, it was foreseeable that Defendants' actions would lead to harm to Cider Riot." This claim rests largely on evidence of speeches and other statements that Gibson made about Antifa and its association with Cider Riot, as well as evidence of prior violent acts and vandalism against Cider Riot, acts that indicated Antifa was the target.

    We have no doubt that, on this record, a reasonable jury could find that it was foreseeable that Gibson's anti-Antifa advocacy, together with his comments associating Cider Riot with Antifa, would lead to violent or unlawful acts against plaintiffs. But, as explained in *Counterman* and Judge Willett's dissenting opinion in *Mckesson*, the First Amendment does not allow for imposition of liability for speech or for protest organization based on a negligence standard. For that reason, plaintiffs have not established a *prima facie* case of actionable negligence against Gibson, and the trial court erred in denying the special motion to strike the negligence claim against Gibson.

    b.  Trespass

    Plaintiffs' second claim against Gibson is trespass. "Trespass to real property is an intentional entry upon the land of another by one not privileged to enter." *Collier v. City of Portland*, 57 Or App 341, 344, 644 P2d 1139 (1982). Here,

plaintiffs have identified no evidence that Gibson entered the Cider Riot property. Indeed, in their discussion of the evidence supporting a *prima facie* case of trespass, plaintiffs have not pointed to any particular evidence in support of their trespass claim.[9] Rather, their theory on appeal is that Gibson caused others to throw objects or spray pepper spray onto plaintiffs' property. Having reviewed the record on our own, we have been able to locate no evidence that would allow the reasonable inference that Gibson himself directed or authorized third parties to throw objects or spray mace onto plaintiffs' property, that he otherwise directed or authorized third parties to enter plaintiffs' property, or that he ratified any intrusion onto plaintiffs' property. The trial court erred in denying the special motion to strike the trespass claim as to Gibson.

### c.  Intentional infliction of emotional distress

Plaintiff Goldman-Armstrong asserts a claim of intentional infliction of emotional distress (IIED) against defendant Gibson. A *prima facie* showing of IIED requires a plaintiff to submit sufficient evidence from which a reasonable trier of fact could find that he met his burden of production for the following elements: "'(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct.'" *Mullen v. Meredith Corp.*, 271 Or App 698, 713, 353 P3d 598 (2015) (quoting *Sheets v. Knight*, 308 Or 220, 236, 779 P2d 1000 (1989) *abrogated on other grounds by McGanty v. Staudenraus*, 321 Or 532, 901 P2d 841 (1995)).

Having reviewed the record, taking into account the protections of the First Amendment, much of the evidence would not allow for the conclusion that Gibson's "acts

---

[9] In their response to the special motion to strike, after citing to trespass cases, plaintiffs' argument in support of their trespass claim was limited to the following:

"Plaintiffs have presented admissible evidence that Gibson interfered with Plaintiffs' ability both to admit, or to evict or exclude, visitors to Cider Riot. Goldman-Armstrong asked Defendants to leave. This satisfies Plaintiff's burden of production."

(Internal citations to declarations omitted).

constituted an extraordinary transgression of the bounds of socially tolerable conduct" in a way that would permit the imposition of liability consistent with the First Amendment. *Mullen*, 271 Or App at 713. The conduct of Gibson and other individuals involved with Patriot Prayer no doubt caused emotional distress to plaintiff Goldman-Armstrong. The same thing, however, is undoubtedly true with respect to much protest activity targeting a business because such activity interferes with business. In other words, as with the Black Hats in *Claiborne Hardware*, protest activity that is protected by the First Amendment may often result in the intended infliction of emotional distress but, because of the First Amendment protections, will not give rise to tort liability. 458 US at 927-29.

Nevertheless, as the trial court recognized, plaintiff Goldman-Armstrong produced evidence of some conduct by Gibson that would allow for the imposition of liability for IIED consistent with *Claiborne Hardware*. In support of plaintiffs' *prima facie* case, Justin Allen averred that he observed Gibson "encourage and direct defendant Cooper to engage a bar patron in a street fight, saying, 'Go on, go on.'" Directing a person to engage in physically assaultive conduct is not protected activity under *Claiborne Hardware*. 458 US at 916. For that reason, Allen's declaration could support the imposition of tort liability on defendant Gibson.[10] Although the video evidence tends to paint a different picture of events, it does not compel the conclusion that Allen's testimony is inaccurate or that the identified conduct by Gibson is protected by the First Amendment. Furthermore, that conduct of directing someone to engage in a street fight with one of Goldman-Armstrong's patrons could, in context, permit a rational inference that it was intended to cause Goldman-Armstrong severe emotional distress. In addition, there is evidence that it did, in fact, play a causal role in Goldman-Armstrong suffering severe emotional distress. In his declaration, Goldman-Armstrong represented that

_____

[10] Because the record would allow a reasonable factfinder to infer that Gibson directed another person to engage in a street fight with one of plaintiffs' patrons, we need not, and do not, address whether there is evidence that would support an inference that Gibson also authorized or ratified any of the other violent acts that occurred on May 1.

he has suffered fear, anxiety, sleeplessness, and back and neck pain because of defendants' acts on May 1, including the acts of Gibson. Finally, a factfinder could permissibly conclude not only that the conduct of directing someone to engage plaintiff's patron in a street fight falls outside of the range of conduct protected under *Claiborne Hardware*, but also that it "constitute[s] an extraordinary transgression of the bounds of socially tolerable conduct." *Mullen*, 271 Or App at 713. The trial court therefore correctly concluded that Goldman-Armstrong established a *prima facie* case of intentional infliction of emotional distress. Of course, as in *Claiborne Hardware*, any eventual judgment for damages would have to be tailored to the damages caused by the particular act of violence that Gibson directed. *Claiborne Hardware*, 458 US at 926 (requiring "a judgment tailored to the consequences of [the] unlawful conduct" of the defendants who engaged in unlawful conduct). But such a tailored judgment is permitted by the First Amendment.

      d.   Intentional interference with economic relations

Plaintiffs' final claim is for IIER. The *prima facie* elements of a claim for IIER are:

> "(1) the existence of a professional or business relationship \*\*\*, (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages."

*McGanty*, 321 Or at 535 (citing *Straube v. Larson*, 287 Or 357, 360-61, 600 P2d 371 (1979); *Wampler v. Palmerton*, 250 Or 65, 73-76, 439 P2d 601 (1968)). Plaintiffs predicate this claim both on Gibson's conduct during the May 1 incident, and on his subsequent conduct of encouraging reports about Cider Riot to the OLCC. At least with respect to the May 1 incident,[11] we conclude that plaintiff has established a *prima facie* case of IIER. Specifically, the same conduct that would support the imposition of liability for IIED would support the

---

[11] As to Gibson's conduct encouraging reports to the OLCC, plaintiffs did not introduce evidence of the content of those reports but, instead, summarily characterized them as untrue. Absent evidence of the content of the reports demonstrating that the reports were, in fact, false, plaintiffs have not established that they suffered any cognizable damages from Gibson's conduct.

imposition of liability for IIER. To the extent that Gibson's conduct of directing a person to engage in a fight with a bar patron interfered with plaintiffs' business relationships by deterring customers from patronizing Cider Riot, and there is some evidence that all the violent acts of May 1 deterred customers, that would support the imposition of liability for IIER on Gibson in way that does not run afoul of *Claiborne Hardware.* In particular, that conduct, along with other evidence in the record, could support a finding that Gibson, a third party to plaintiffs' relationships with their customers, interfered with plaintiffs' relationships with their customers by encouraging assaultive conduct against one of their patrons, something that deterred patrons from patronizing plaintiffs' business, resulting in damages. For that reason, the trial court did not err in denying Gibson's special motion to strike the IIER claim. Of course, as noted above, under *Claiborne Hardware*, any ultimate damages award would have to be tailored to the harm caused by the specific conduct that is not entitled to First Amendment protection, should a factfinder find in plaintiffs' favor on the other elements of the claim.

## V.   CONCLUSION

We affirm the limited judgment denying the special motion to strike of defendants Kramer, Ponte, Willis, and Lewis. We reverse the limited judgment denying the special motion to strike of Patriot Prayer USA, LLC. We reverse the limited judgment denying the special motion to strike of defendant Gibson insofar as it denied the motion as to the claims of negligence and trespass. We affirm the denial of the motion to strike insofar as it declined to strike the claims for IIED and IIER.

Reversed in part; otherwise affirmed.